## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:25-cv-2014

UNITED SPINAL ASSOCIATION;
NOT DEAD YET;
INSTITUTE FOR PATIENTS' RIGHTS;
ATLANTIS ADAPT; and
MARY GOSSMAN

                      Plaintiffs,

    v.

STATE OF COLORADO;
JARED POLIS, in his official capacity as
Governor;
COLORADO DEPARTMENT OF PUBLIC
HEALTH AND ENVIRONMENT; JILL
RYAN, in her official capacity as Director of
CDPHE;
COLORADO MEDICAL BOARD; AND
ROLAND FLORES, in his official capacity
as the President of the Colorado Medical
Board;

                      Defendants.

---

## COMPLAINT

---

## INTRODUCTION

1.      Plaintiffs, people with life-threatening disabilities and organizations that represent and advocate for people with life-threatening disabilities, bring this action to stop the Defendant government officials from running a deadly and discriminatory system that steers people with life-threatening disabilities away from necessary lifesaving and preserving mental health care, medical care, and disability supports, and toward death by suicide under the guise of "mercy"

and "dignity" in dying.

2.      When first passed in 2016, Colorado's End of Life Options Act ("EOLOA" or

"the Act") allowed physicians to prescribe drugs not to alleviate pain or suffering, but instead to

cause the death of the patient—to intentionally facilitate suicide.  In 2024, Colorado expanded

EOLOA to allow Advanced Practice Registered Nurses ("APRN"), to certify patients as

terminally ill and to prescribe lethal drugs on that basis, even though APRNs cannot make the

same terminal illness certification for hospice eligibility.  For this reason, this Complaint will use

the term "assisted suicide" rather than the more conventional "physician-assisted suicide" to

refer to the practice of providing lethal drugs whether by doctors or APRNs.  The law does not

require any evaluation, screening or treatment by a mental health professional for serious mental

illness, depression or treatable suicidality before the lethal prescription is written.  While

providers are given the option of involving mental health professionals to "assist" in determining

if the suicidal patient is "mentally capable," in 2023, providers never once consulted a mental

health professional.  The provider need not have expertise with the patient's specific illness or

condition and need not be trained on mental health symptoms or side effects associated with the

patient's illness or treatment.  While the provider is supposed to discuss "feasible" alternatives to

suicide, such as palliative care, mental health treatment, or hospice placement with the patient,

the provider is not required to do anything to help the patient obtain access to these frequently

difficult to obtain services.  The EOLOA "Attending Provider Reporting Form" published by the

Colorado Department of Public Health does not even mention discussing alternatives or require

the provider to certify that this requirement has been met.  The full "process" can happen within

one week, or even immediately if a single provider decides the patient has less than 48 hours to

live.

3.      Assisted suicide under EOLOA violates federal disability rights laws and the
federal constitutional guarantees of due process and equal protection which protect people with
disabilities from discrimination, exclusion and life-threatening state action.  Under federal law, a
public entity may not withhold services or make services available on unequal terms based on
disability.  The Colorado government agencies and officials named in this action fund and
operate public health, social services, and medical profession regulations to provide protective
services for people who express suicidality, and to prevent medical professionals, caregivers, and
family members from taking advantage of, or encouraging, a person's impulse for self-harm or
suicide.  Through Colorado's EOLOA, however, the entire protective network of services is
withdrawn from plaintiffs and their members—solely based on a provider's good faith prediction
of death within six months.  This creates a two-tiered medical system in which people who are
suicidal receive radically different treatment responses by their providers and protections from
the State depending on whether the patient has what the provider deems to be a "terminal
disease," i.e., based on disability.

4.      EOLOA discriminates against people with life-threatening disabilities by
arbitrarily depriving them of protections afforded to others in violation of the Americans with
Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504") and
Section 1557 of the Affordable Care Act ("ACA").  The Plaintiff organizations represent
members who have disabilities within the meaning of the ADA, Section 504, and the ACA and
as such are protected by those statutes.  The State provides mental health care, supportive
services and other suicide prevention measures to non-disabled people who express a wish to die,

but channels and steers persons with disabilities, including people with eating disorders, spinal cord injuries, and other life-threatening or terminal or disabilities toward assisted suicide instead.

5.      EOLOA does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering and violates the Equal Protection Clause of the Fourteenth Amendment by treating differently people with life-threatening disabilities as compared to everyone else who expresses a wish to die to their medical provider.  There is no rational basis for EOLOA's "terminal" classification given that medical professionals often misdiagnose some patients as having terminal diseases, physicians' prognoses of six months to live are often fallible, and the "terminal" classification includes people who can live a longer life span with treatment and supports, including individuals who have eating disorders, spinal cord injuries, and other disabilities, such as diabetes, that are treatable.  EOLOA's very purpose and core requirement—providing an early death to someone who will die from a terminal illness within six months—is irrational, unreliable, and discriminatory, in violation of both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

6.      EOLOA violates the Due Process Clause of the Fourteenth Amendment because it lacks the safeguards needed to protect people with life-threatening disabilities from self-inflicted death caused by impaired judgment, depression, and undue influence by others.  Despite established medical knowledge that those with life-threatening disabilities are at greater risk of depression and suicidal ideation, there is no requirement for a mental health evaluation or any oversight that judgment is not impaired at the time of ingestion.

7.      Plaintiffs ask the Court to declare the EOLOA to be in violation of federal disability law and the United States Constitution and to enjoin Defendants from allowing the

practice of assisted suicide under EOLOA.

## JURISDICTION

8.      An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

9.      This Court has jurisdiction over Plaintiffs' claims arising under the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

10.      This Court has jurisdiction over Plaintiffs' claims arising under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

11.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. §§ 12101 *et seq.*, 29 U.S.C. § 794 and by the general legal and equitable powers of this Court.

## VENUE

12.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because at least one plaintiff resides in this district, one or more defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

13.      Plaintiff United Spinal Association ("United Spinal") is a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946. United Spinal is run by a Board of Directors, the majority of whom are people with disabilities, and staff that includes people with spinal cord injuries. United Spinal is dedicated to empowering and

[4709655.17]

advocating for people living with spinal cord injuries and diseases ("SCI/D") and all wheelchair users, including veterans, to obtain greater independence and quality of life.  United Spinal's core business activity is to advance opportunities, social equity, and disability rights for all people living with a spinal cord injury or disease.  This includes work on issues such as increasing access to quality affordable health care and independent living services; enhancing and reforming government benefit systems; and preserving social security benefits—including in Colorado.  United Spinal has approximately 60,000 members nationally, and approximately 900 of whom reside in Colorado and access United Spinal's services.  United Spinal also works directly with specialized rehabilitation hospitals, such as Craig Hospital in Englewood, Colorado and the PAM Health Specialty Hospital in Denver, Colorado on best practices, training and treatments for individuals with spinal cord injuries.

14.    Spinal cord injuries are often unexpected and initially devastating to the newly injured and their family members.  Newly injured members of United Spinal have faced and will continue to face significant possible challenges including loss of some independence, depression, isolation, loss of self-confidence, and anxiety about what the future will bring.  Many have initially had suicidal thoughts on occasion.  Many have also been depressed after injury and while living in the community.  In response to these needs, United Spinal operates a peer mentor support program that brings together people who have experience living with spinal cord injuries with others who are navigating similar challenges.  United Spinal's peer mentors provide information and support to members about their personal empowerment and suicide prevention.

15.    While United Spinal helps its members live independently and effectively in the community, some members are unable to do so because of systemic problems in the healthcare

and benefits systems as well as discrimination on the basis of disability. Many of United Spinal's members have directly experienced discrimination by medical professionals and others, including denial and delay of necessary medical services, by being told that their quality of life is poor and that if they had to live like them, they would kill themselves, as well as by being delayed or denied basic services and supports necessary for living at home with paralysis.

16.    People with spinal cord injuries generally consider themselves as having a static disability, one that can be addressed with the right care, services, and supports. Some members have been told by doctors that their condition is "terminal," and that they may have a shortened amount of time to live—yet the dire predictions are often proved wrong.

17.    As a result of being perceived as terminally ill by their medical care providers, some of United Spinal's members qualify for assisted suicide and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression. Upon information and belief, United Spinal members in Colorado have discussed, considered, and on information and belief, accessed lethal medications and/or committed suicide by means of EOLOA. The Act places United Spinal's members at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty. United Spinal brings this action on behalf of its members because the interests at stake are germane to United Spinal's purpose of empowering and advocating for people living with spinal cord injuries and diseases to obtain greater independence and a higher quality of life.

18.    United Spinal and its membership have been injured as a direct result of Defendants' actions and omissions alleged herein. In addition to placing United Spinal members at risk of premature death by assisted suicide, Defendants' actions and omissions have injured

the organization's core business activity of empowering and advocating for people with spinal cord injuries to obtain better quality of life and greater independence. United Spinal has tried to protect its core business activities from this harm by diverting resources to address and counteract concerns about assisted suicide in Colorado as well as advocating for its members and constituents who are placed at risk of harm by EOLOA and/or at risk of being steered toward utilizing assisted suicide. United Spinal has expended resources on education and outreach campaigns targeted at addressing assisted suicide. This includes publishing a position statement opposing assisted suicide and a message from the organization's CEO about the dangers of the practice. United Spinal has held public information discussions to inform its members concerning assisted suicide laws and their impact on equality, dignity, and access to care for people with disabilities. United Spinal is unable to devote these resources to its other critical programs. By steering people with spinal cord injuries towards assisted suicide, EOLOA impedes United Spinal's core business activity of supporting their members in obtaining greater quality of life.

19.     Plaintiff Atlantis ADAPT is a grass roots community-based organization based in Denver, Colorado, that provides services by and for people with disabilities, including people with life-threatening disabilities.

20.     Atlantis ADAPT began in 1983. Its current name derived from two of its early organizing campaigns, "Americans Disabled for Accessible Public Transit" and "Americans Disabled for Attendant Programs Today." Both projects remain central to Atlantis ADAPT's mission. Atlantis ADAPT's projects are wide-ranging, and include helping people with disabilities transition from nursing homes to the community, helping its members and other

persons with disabilities secure the services they need to continue living in the community, and

providing a focal point for community organizing to secure accessible transportation, and to

protect and expand access to in-home supportive services.

21.     Atlantis ADAPT has been injured as a direct result of Defendants' actions and

omissions alleged herein.  The interests Atlantis ADAPT seeks to protect through this litigation

are central to its core business activities.  These core business activities include helping its

members and other persons with disabilities to overcome the stigma and social pressures to

isolate themselves in nursing homes and institutions, and to accept second-class services and

health care, and ultimately to remove themselves from the world by dying an early death.  By

furthering the deaths of constituents who would have sought out and benefited from Atlantis

ADAPT services, Defendants' actions and omissions undermine the effectiveness of the

programs and services Atlantis ADAPT provides.

22.     Atlantis ADAPT has lost members to death by physician assisted suicide in

Colorado.  Among them was Ana who was 22 years old when she joined Atlantis ADAPT in

2017.  Ana was a licensed private pilot and ground instructor, having started flight training at age

12 and securing her license at age 17.  She lived with various disabilities, including deafness and

the use of a wheelchair for mobility.  Ana had significant health challenges, and ongoing care

needs, and turned to Atlantis ADAPT for help to get her care needs met and preserve her ability

to be in the community.  In 2019, Ana had been working with Atlantis ADAPT volunteers for

over a year, when she had an acute health problem.  Atlantis ADAPT members, as well as

members of the Plaintiff organization Not Dead Yet, reached out to her to offer alternatives to

dying by suicide, and support to continue living.  Ana was offered a lethal prescription under

EOLOA during an acute health crisis and died by suicide at age 23.

23.    Defendants' promotion of physician assisted suicide through EOLOA has harmed Atlantis ADAPT's core business activities.  Atlantis ADAPT's core business activity is to assist its members and others to live outside of institutions such as nursing homes.  Atlantis ADAPT volunteers have had to provide additional educational programs to counteract the de-valuing of disabled lives under EOLOA and has had to divert already scarce resources to identify, investigate, and address its impact on its constituents, including by offering suicide prevention peer support services as well as by providing presentations and other educational materials on the value of the lives of people with disabilities.  Because EOLOA threatens the lives of people with disabilities, Atlantis ADAPT volunteers must spend substantial time to provide enhanced peer counseling and case management to ease the anxiety and fears regarding consumers' end of life decisions.

24.    Plaintiff Not Dead Yet ("NDY") is a national disability rights organization formed in 1996 to articulate and organize the disability rights opposition to the legalization of assisted suicide, to oppose public policies that allow the involuntary withholding of life-sustaining medical treatment, and to advocate for equal protection of the law in cases of homicides of disabled persons.  NDY is headquartered in Rochester, New York and operates under the fiscal sponsorship of The Center for Disability Rights, Inc., a non-profit, community-based advocacy and service organization for people with all types of disabilities.

25.    NDY's core activity is to advance the rights of people with disabilities to live free from pressure from a medical care system grounded in the misconception that people with disabilities are leading lives that are not worth living.  Its work includes ensuring that the

withholding or withdrawal of life-sustaining medical treatment is truly voluntary and based on informed consent with meaningful alternatives, including long-term services and supports to live in the community; opposing futility policies involving unilateral or involuntary health care provider decisions to withhold or withdraw life-sustaining medical treatment; and advocating for equal protection of the law in homicide cases when the victim is old, ill, or disabled.

26.     NDY has been injured as a direct result of Defendants' actions and omissions alleged herein.  Defendants' actions have impeded its core business activities of protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment, medical rationing based on policies such as Quality Adjusted Life Years ("QALY"), to ensure that persons with disabilities receive equal protection of the law in cases of homicides of disabled persons, and to protect persons with disabilities from the expansion of assisted suicide schemes to additional jurisdictions, and the removal of the few safeguards provided in existing schemes.  EOLOA harms NDY's core business activities by exposing persons with disabilities to a State-sponsored system of early death by suicide, exclusively for persons with disabilities, in this case of so-called "terminal" disabilities, including such treatable problems as eating disorders.

27.     Plaintiff Institute for Patients' Rights ("IPR") is a national, 501(c)(3) organization that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues.  IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of care put in place during the COVID-19 pandemic that placed people with

[4709655.17]

disabilities at risk of harm; advocating against the use of the QALY metric, which discriminates against and diminishes the value of the lives of people with disabilities; educating the public about disparities in healthcare access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services. IPR staff and board members regularly give presentations on these issues and engage with the press to raise awareness and educate the public on these topics.

28.     IPR has been injured as a direct result of Defendants' actions and omissions alleged herein. IPR's core business activity is to help persons with disabilities get the care they need from the medical care system without the discriminatory barriers described above. EOLOA adds a new barrier by licensing medical provides to facilitate premature death in lieu of treatment. To address the harms of this new barrier, IPR has had to develop new courses and materials to address the ways in which the scheme steers its constituents away from quality health care, and toward early death through prescription of lethal medications. By expending resources on these and other EOLOA-specific activities, IPR is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies.

29.     IPR is a sister organization of the Patients' Rights Action Fund ("PRAF"), a national, non-partisan single-issue 501(c)(4) organization that protects the rights of patients, people with disabilities, older adults, and economically disadvantaged people from deadly harm and discrimination inherent in assisted suicide laws. PRAF lobbies and advocates in state legislatures and Congress for patient access to high-quality multidisciplinary end-of-life care and works against efforts that devalue and deprioritize healthcare for vulnerable people—such as

QALYs and assisted suicide.

30.     Mary Gossman is a twenty-six year old woman who was born and raised in Colorado.  She is a full-time student studying for a BA in Philosophy.  She tutors middle school and high school students in History and Latin.  She was also recently married after meeting her spouse in a book club.  She resides in Littleton, Colorado.

31.     Mary has struggled with eating disorders and depression through most of her life. She has been diagnosed with anorexia, major depressive disorder, and other mental health conditions and is a person with multiple disabilities as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).  She has been hospitalized twice in Colorado for her anorexia, once in the fall of 2022 and again in late 2023.  The first time she was hospitalized, she was told that she could die within weeks because her heart was failing.

32.     The hospitals recognized that Mary was at a heightened risk for suicide during her admissions.  Every day she was asked to rate her urge to self-harm and suicidal ideation.  All sharp things were removed from her vicinity, including pens with metal pieces, and she was not allowed to have belts, or other items such as shampoo if alcohol was in the top three ingredients. She was not allowed to manage her own medications and staff checked in on her every fifteen minutes, including throughout the night.  She understands that she could have been forcibly fed as a life-saving measure if she refused to eat.

33.     When she was discharged from her first hospitalization, her treatment team told her there was nothing more they could do for her.  Her former psychiatrist, who initially recommended hospitalization, had also repeatedly told her she was running out of options regarding medication and treatment for her depression.  Mary felt abandoned and discouraged,

especially when she was told after her second hospitalization that she was at a high risk of relapse.

34.     Mary believes that if she were offered life-ending drugs at the time of her hospitalizations, she would have accepted them.  At the time, she was trying to die through her anorexia.  The treatment center rightfully treated her as though she was suicidal.  She does not believe she would have had the capacity to make that decision while she was in the acute phase of her anorexia, because her judgment was clouded by her illness.

35.     Mary was able to locate a psychiatrist and nutritionist who have helped her manage her anorexia and major depressive disorder with outpatient treatment.  She has been able to lead a fulfilling life and is grateful that she received supportive mental health care and was prevented from self-harm and suicide.

36.     Even so, Mary knows that given the features of her multiple diagnoses, she could relapse.  She knows that it is likely that she could be hospitalized again for anorexia in Colorado and that she could be steered or encouraged to accept and use life-ending drugs to commit suicide under EOLOA if she is given a diagnosis of "terminal anorexia."  Pursuant to EOLOA, Mary's eating could be deemed "terminal" after a relapse.  Mary, as a person with active anorexia, at risk of hospitalization, reasonably fears that Colorado's EOLOA puts her at direct risk of death by assisted suicide.

37.     Defendant State of Colorado ("State" or "Colorado") is the legal and political entity responsible for enacting and enforcing State laws and legislation, including EOLOA.

38.     Defendant Jared Polis is sued in his official capacity as Governor of the State of Colorado.  He is vested with the supreme executive power of the State and has the duty to see

that the State's laws are faithfully executed.  Governor Polis possesses the authority to supervise and assign functions among executive officers and agencies, other than elective officers and agencies administered by elective officers.  Governor Polis is tasked with appointing the members of the Medical Board and can remove any member of the board for continued neglect of duty, incompetence, or unprofessional or dishonorable conduct.  He signed into law the 2024 amendments to EOLOA which dramatically increased the danger of death by suicide to plaintiffs, their members and constituents and all people with disabilities in Colorado by, for example, shortening and even eliminating waiting periods and allowing non-M.D.'s to be providers of assisted suicide.

39.    Defendant Department of Public Health and Environment ("CDPHE") is one of 16 cabinet-level departments whose executive director is appointed by the governor.  CDPHE's mission is to advance Coloradan's health and protect the places Coloradans live, learn, work, and play.  CDPHE pursues its mission through broad-based health and environmental protection programs and activities including chronic disease prevention, general promotion of health and wellness, health facilities licensure and certification, consumer protection,  and suicide prevention, among other activities.

40.    CDPHE facilitates assisted suicide in part by making available on its website the forms providers must complete when participating under the Act.  CDPHE also collects and reviews documentation submitted by medical providers pursuant to EOLOA, including assisted suicide requests and physician forms, regulates the collection of this information, and publishes a

report annually based on the information collected.[1]

41.     CDPHE receives federal funds and has received such funds at all times relevant to

this complaint.  For fiscal year 2021-22, the department received approximately 87% of its $690

million funding from federal funds, fees, grants and other non-general fund sources.  CDPHE is

also the parent agency of the Colorado Office of Suicide Prevention which lists its mission as "to

serve as the lead entity for suicide prevention intervention supports and postvention efforts in

Colorado."[2]

42.     Defendant Jill Ryan is sued in her official capacity as the Director of CDPHE.  In

these positions, she has control over the CDPHE and is appointed by the Governor.

43.     Defendant Colorado Medical Board ("CMB") is a government agency within the

California Department of Consumer Affairs.  The CMB was instituted as part of the Medical

Practice Act for the purpose of regulating and controlling the practice of healing arts, which

include establishing and enforcing the licensing standards for Medical Doctors (M.D.s), Doctors

of Osteopathy (D.O.s), Physician Assistants (P.A.s), and Anesthesiology Assistants (A.A.s).  The

CMB is a Type I Board, meaning that it is policy autonomous and comprised of professional and

public members (eight M.D.s, three D.O.s, two P.A.s, and four public members).[3]  The CMB

---

[1] Colo. Rev. Stat. Ann. § 25-48-111(2); 6 C.C.R. § 1009-4 (CDPHE regulations governing
collection of information from providers); *Medical Aid in Dying*, Colo. Dep't of Public Health
and Env't, https://cdphe.colorado.gov/center-for-health-and-environmental-data/registries-and-
vital-statistics/medical-aid-in-dying (last visited March 26, 2025).

[2] *Office of Suicide Prevention Fact Sheet*, Colo. Dep't of Public Health and Env't,
https://cdphe.colorado.gov/suicide-prevention/office-of-suicide-prevention-fact-sheet (last
visited June 18, 2025).

[3] *Welcome to the Medical Homepage*, Colo. Dep't of Regul. Agencies,
https://dpo.colorado.gov/Medical (last visited June 18, 2025).

investigates the unlicensed practice of medicine, and its decisions are not subject to administrative review.  It also has the power to promulgate rules; make investigations, hold hearings, and take evidence in accordance with the Medical Practice Act; and aid law enforcement in the enforcement of the Medical Practice Act and in the prosecution of all persons, firms, associations, or corporations charged with the violation of any of its provisions.  Licensure is mandatory to practice medicine in Colorado or to treat Colorado patients while exceptions exist for the Veterans Administration, Bureau of Indian Affairs, and Department of Defense physicians and other licensed healthcare providers.

44.    Defendant Roland Flores is sued in his official capacity as the President of the CMB.  His duties include administering the licensing, regulatory, and disciplinary functions of the CMB.

45.    Defendants, collectively and through their respective duties and obligations, are responsible for administering and/or enforcing the Act.  Each Defendant, and those subject to their direction, supervision, and control, has the responsibility to intentionally perform, participate in, aid and/or abet in the administration or enforcement of the Act.

## FACTUAL BACKGROUND

### I.    Suicide

46.    Suicide is death caused by injuring oneself with the intent to die.  Death from suicide "is highly prevalent in already marginalized and discriminated groups of society."[4]  The Centers for Disease Control and Prevention ("CDC") reports that suicide is "[o]ne of the 10

---

[4] World Health Org., Preventing Suicide: A Global Imperative 3 (2014), https://apps.who.int/iris/bitstream/handle/10665/131056/9789241564779_eng.pdf?sequence=1.

leading causes of death in the United States."[5]  Between 2001 and 2021, national suicide rates

increased most years.[6]

47.     Legal responses to suicide have evolved since the founding of the United States.

Suicide itself was a crime at the nation's founding, with "punishments" exacted against the

property of the decedent.  By the end of the 19th century, most U.S. states had changed their laws

so that suicide itself was no longer a crime.  Reformers sought to decriminalize suicide itself as

part of a recognition that suicide was caused by mental illness.  Removing the criminal penalties

against suicide reduces social stigma, helps remove barriers to obtaining adequate mental health

care, increases access to emergency medical services, fosters suicide prevention activities,

improves the well-being of people vulnerable to suicidal behaviors, and contributes to more

accurate monitoring of suicidal behaviors.

48.     The act of assisting suicide *remains* criminalized in most states, as it has been

since the founding of this country.[7]  Intentionally causing or aiding another person to die by

suicide remains a class 4 felony in Colorado.  Col. Rev. Stat. § 18-3-104.

49.     People with disabilities are significantly more likely than those without

disabilities to report suicidal ideation, suicide planning, and suicide attempts.  People with

---

[5] U.S. Surgeon General & Nat'l Action Alliance for Suicide Prevention, The Surgeon General's
Call to Action to Implement the National Strategy for Suicide Prevention ("Surgeon General's
Call to Action") 11 (2021), https://www.hhs.gov/sites/default/files/sprc-call-to-action.pdf.

[6] Cheryl Platzman Weinstock, *Decades of National Suicide Prevention Policies Haven't Slowed
the Deaths*, KFF Health News (Sept. 16, 2024), https://kffhealthnews.org/news/article/national-
suicide-prevention-strategy-action-plan-rising-rates-deaths/.

[7] *Washington v. Glucksberg*, 521 U.S. 702, 715 (1997) ("By the time the Fourteenth Amendment
was ratified, it was a crime in most States to assist a suicide.").

cognitive, complex activity (defined as self-care and/or independent living tasks), and multiple

disabilities have the highest risk of suicidal thoughts, suicide planning, and suicide attempts.

50.    In 2023, the most recent year for which annual data is available, the suicide

fatality rate in Colorado was 20.93 per 100,000, one of the highest in the nation.[8]  During 2023,

1,290 people died by suicide in Colorado.[9]  Suicide is a leading cause of death for young adults

in Colorado.[10]

## II.    Colorado's Suicide Prevention Programs

51.    Colorado offers and provides extensive suicide prevention programs and services.

Colorado's Suicide Prevention Commission is a twenty-two member commission that devises

suicide prevention recommendations for Colorado.  Commission members have direct

experience with suicide or professional expertise in suicide prevention.  The Director of the

CDPHE appoints Commission members.

52.    The Office of Suicide Prevention ("OSP") is an office within the Colorado

Department of Public Health and Environment.  OSP is the lead government entity in Colorado

for suicide prevention intervention and postvention efforts.  OSP reports quarterly to the Suicide

Prevention Commission, and OSP incorporates the Suicide Prevention Commission's

recommendations into its work.

53.    OSP administers grants to finance suicide prevention programs in schools and in

---

[8] Office of Suicide Prevention, 2024 Annual Report 15-16 (Nov. 1, 2024),
https://drive.google.com/file/d/14o8U4HLrbm7MFx6I2UMvWW4ITVvY5GLC/view.

[9] *Id.*

[10] *Youth and young adult suicide prevention*, Colo. Dep't of Public Health and Env't,
https://cdphe.colorado.gov/suicide-prevention/youth-and-young-adult-suicide-prevention (last
visited March 31, 2025).

Colorado communities, and provides technical assistance on matters related to suicide prevention.[11] OSP also offers healthcare providers suicide prevention resources, hospitals training and written resources on suicide prevention and care for patients after a suicide attempt, and resources for families and communities grappling with loss due to suicide.[12] OSP funds follow-up services for patients after discharge from an emergency department due to a suicide attempt, mental health crisis, or overdose.[13] In the 2023-2024 fiscal year, OSP funded suicide prevention therapy for over 750 young Coloradans, funded follow up services for over 13,000 Coloradans after discharge from emergency departments after mental health or behavioral health crises, including suicide attempts, and funded "Man Therapy" to reach out to men who work in industries with a heightened risk of suicide.[14]

54.     Through OSP and CDPHE, Colorado also provides guidance to local public

---

[11] *Office of Suicide Prevention Funding Opportunities*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/office-of-suicide-prevention-funding-opportunities (last visited March 31, 2025); *Colorado- National Collaborative (CNC) Kick-Start Communities - RFA #32652159*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/RFA32652159 (last visited March 31, 2025); *Colorado Gun Shop Project*, Colo. Dep't of Public Health and Education, https://cdphe.colorado.gov/suicide-prevention/gun-shop-project (last visited March 31, 2025); *What has the Commission accomplished?*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/suicide-prevention-commission/what-has-the-commission-accomplished (last visited March 31, 2025).

[12] *After A Suicide Loss*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/after-a-suicide-loss (last visited March 31, 2025); *Suicide prevention resources for primary care providers*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/suicide-prevention-resources-for-primary-care-providers (last visited March 31, 2025).

[13] *The Follow-Up Project*, Colo. Dep't of Public Health and Env't, https://cdphe.colorado.gov/suicide-prevention/the-follow-up-project (last visited March 31, 2025).

[14] Office of Suicide Prevention, 2024 Annual Report 8-10 (Nov. 1, 2024), https://drive.google.com/file/d/14o8U4HLrbm7MFx6I2UMvWW4ITVvY5GLC/view.

agencies on investigating suicide deaths, provides a form to facilitate collection of this

information, and collects suicide investigation information.[15]  OSP also works to improve data

tools to improve access to suicide-related data.[16]  CDPHE publishes a Suicide Death

Investigation Form "to standardize investigations of, and reports on, the cause and contributors

to suicide deaths." CDPHE excludes assisted suicide from these reports and investigations.

CDPHE also operates the Colorado Violent Death Reporting System which is part of the

National Violent Death Reporting System, funded by the U.S. Centers for Disease Control and

Prevention, and publishes detailed information about suicides, including rates, locations, age,

method and location.[17]  CDPHE provides false and inaccurate information to the National

Violent Death Reporting System as it knowingly excludes suicides by persons provided lethal

prescriptions under EOLOA.

     55.     CDPHE, in its implementation and enforcement of EOLOA, deprives people with

life-threatening disabilities of the protections of these programs and services designed to identify

and protect persons who are at risk of suicide, fails to investigate and accurately report on actual

deaths of persons under EOLOA, and knowingly permits inaccurate information to be collected

and reported about prescriptions and deaths by suicide under EOLOA.  EOLOA requires that the

---

[15] *Suicide investigation form*, Colo. Dep't of Public Health and Env't,
https://cdphe.colorado.gov/suicide-prevention/suicide-investigation-form (last visited March 31,
2025).

[16] *What has the Commission accomplished?*, Colo. Dep't of Public Health and Env't,
https://cdphe.colorado.gov/suicide-prevention/suicide-prevention-commission/what-has-the-
commission-accomplished (last visited March 31, 2025).

[17] *Colorado Violent Death Reporting System*, Colo. Dep't of Public Health and Env't,
https://cdphe.colorado.gov/center-for-health-and-environmental-data/registries-and-vital-
statistics/colorado-violent-death-reporting-system (last visited June 18, 2025).

cause of death on a patient's death certificate be inaccurately reported as the underlying

"terminal illness" and not death by suicide.  CDPHE does not "follow up with providers who

prescribe aid-in-dying medication, patients, or their families to obtain information about use of

aid-in-dying medication."[18]  CDPHE admits that each year it receives evidence that doctors are

prescribing aid-in-dying medications to patients without appropriate documentation required by

the law including the patient's signed written request and the consulting physician's written

confirmation that the patient qualifies under EOLOA.[19]  Neither CDPHE, nor any other

Colorado governmental agency is charged with following up and/or investigating the

circumstances of these deaths.

### III.    Colorado's End of Life Options Act

56.    EOLOA was enacted in 2016 and amended in 2024 in a manner that made it more

dangerous and greatly increased the risk of suicide for people with disabilities.  The law, as

amended, allows dispensing lethal drugs to a patient who makes two oral requests a minimum of

one week apart, plus a written request.  Colo. Rev. Stat. § 25-48-104(1)(a).  If a single provider

determines that a patient has less than forty-eight hours to live, the Act permits same day

dispensing of lethal drugs.  Colo. Rev. Stat. Ann. § 25-48-104(1)(b).  In contrast, Colorado

requires a three-day waiting period for purchasing a firearm.  Colo. Rev. Stat. 18-12-115.  Before

providing the lethal drugs, the provider must confirm that the patient has an "incurable and

irreversible disease" that "will, within reasonable medical judgment, result in death" with "a

---

[18] *Colorado End-of-Life Options Act, 2024 Data Summary, with 2017-2024 Trends and Totals*
("EOLOA 2024 Report"), Colo. Dep't of Public Health and Env't, 1,
https://drive.google.com/file/d/1S3yC6qkS15rywRVUhV_J6CuD3202k2nZ/view

[19] *Id.* at 8-9.

prognosis of six months or less," that the patient has "voluntarily" requested the drugs, and "is

mentally capable" and "is making an informed decision." Colo. Rev. Stat. Ann. §§ 25-48-

102(16), 25-48-106(1)(a).  The 2024 amendment expanded the definition of "proscribing

provider" beyond medical doctors to include APRNs.[20]  Under Colorado law, an APRN, or

advanced practice nurse is a registered professional nurse certified by the State Board of Nursing

to prescribe mediations.  Colo. Rev. Stat. Ann. §§ 12-255-104, 12-255-111.  APRNs are *not*

permitted to certify patients as terminal within six months for purposes of hospice placement.  42

U.S.C. § 1395f(a)(7)(A)(i)(I).  But EOLOA now allows APRNs to make the same certification of

terminal within six months as physicians for purposes of prescribing lethal medications.

57.     If the attending provider believes the patient has more than 48 hours to live, they

are supposed to refer the patient to a consulting provider to confirm the terminal diagnosis,

decision-making capacity, and that the patient is making a voluntary, informed choice.  Colo.

Rev. Stat. Ann. § 25-48-106(1)(d).  The consulting provider also need not be a physician.  Colo.

Rev. Stat. Ann. § 25-48-102(3).

58.     The Act does not require a mental health assessment for the patient requesting

assisted suicide.  The provider must only refer a patient to a mental health professional if the

provider believes "that the individual may not be capable of making an informed decision."

Colo. Rev. Stat. Ann. § 25-48-106(f).  However, the Act does not provide any standards to guide

providers in making this determination, nor does it require training in mental capacity

assessment.  EOLOA assumes that a request for assisted suicide is *not* an indication of a mental

---

[20] 2024 Colo. Legis. Serv. Ch. 406 (S.B. 24-068).

disorder, when other Colorado laws make precisely the opposite assumption for virtually

everyone else, and those laws require interventions up to and including involuntary

hospitalization to test the assumption and diagnose the condition.  Almost no people who are

provided assisted suicide under Colorado's EOLOA are referred for psychological assessments

before receiving lethal prescriptions—just 10 recorded mental health referrals out of over 1,676

provider approvals from 2017-2024.[21]

59.    In determining whether a person's condition meets the definition of "terminal

illness," EOLOA has no requirement that the attending or consulting provider consider the effect

of treatments, counseling, or other supports on survival rates.  Colo. Rev. Stat. Ann. § 25-48-

102(12).  People who would otherwise survive beyond six months if provided treatment or other

supportive services are still eligible for assisted suicide regardless of whether those treatments or

supports are denied by their insurance company, refused, or otherwise not available.  As a result,

conditions that would not otherwise be considered "terminal" with treatment—such as spinal

cord injuries, diabetes, complications from falls, hernias, eating disorders and kidney disorders

requiring dialysis—can and do qualify for assisted suicide.

60.    In addition, the law permits a patient to make themselves eligible for assisted

suicide by declining available medical treatment that would likely extend their lives, such as a

known medical treatment for their disease, kidney dialysis, insulin, or even food and water.

VSED—Voluntary Stopped Eating and Drinking—is the practice of hastening death by

---

[21] *Colorado End-of-Life Options Act, 2024 Data Summary, with 2017-2024 Trends and Totals*,
Center for Health and Environmental Data, Colo. Dep't of Public Health and Env't, 9,
https://drive.google.com/file/d/1S3yC6qkS15rywRVUhV_J6CuD3202k2nZ/view.

foregoing food and water.  There are providers who will certify a patient as "terminal" within six months under EOLOA based on a patient's having begun VSED regardless of whether there is an underlying medical condition.  They advocate for use of VSED as a "bridge" to qualify for lethal drugs under EOLOA for conditions that would otherwise not be considered terminal.[22]

61.    The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely.

62.    EOLOA fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including suicide prevention services, palliative and/or hospice care, medical and nursing support services, and other personal support services that are ostensibly included among the "feasible alternatives" that Colorado providers are supposed to discuss with persons who seek physician-assisted suicide. The Act fails to require the provision or exhaustion of the State's suicide prevention program, which is expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people from taking unnecessary, uninformed, untreated, or otherwise preventable suicidal actions.  The Act directs providers to advise the patient of alternative treatment options, but the requirement is only to "discuss[]" what is "feasible," not actually offer options such as hospice, mental health treatment, and palliative care.  Colo. Rev. Stat. Ann. § 25-

---

[22] Thaddeus Mason Pope & Lisa Brodoff, *Voluntary Stopping Eating and Drinking As a Bridge to Medical Aid in Dying*, 1 J. OF AID-IN-DYING MEDICINE 76 (2023), https://heyzine.com/flip-book/2ce721e795.html#page/77. (In the article, proponents present the case of Cody Sontag, a woman in Oregon in the early stages of Alzheimer's disease, who started VSED on February 8, 2023; on day five, Sontag's physician qualified her for assisted suicide on the grounds that she was dying from dehydration and therefore had a prognosis of six months or less.  Sontag died by assisted suicide, not VSED, on day eight.).

48-106(1)(e)(II).  The Act also requires providers to advise the patient of the risks and results
associated with taking the lethal drug and to confirm that the patient's request did not result from
coercion or undue influence, but the Act has no standard to determine what is coercion or undue
influence.  Colo. Rev. Stat. Ann. § 25-48-106(1)(g).

63.    The Act permits provider shopping, such that if one provider finds the person
ineligible, the person can contact additional physicians or advance practice nurses until they get
approval for assisted suicide.  EOLOA lacks any independent oversight for the decision to grant
an assisted suicide request (i.e., review by a probate court, as with civil commitments).  The
ability to "shop" providers combined with the lack of oversight enables easy evasion of the Act's
safeguards against duress, neglect, and abuse.

64.    Defendant CDPHE, which oversees the EOLOA program, admits that the law
"does not authorize or require the Colorado Department of Public Health and Environment to
follow up with physicians who prescribe aid-in-dying medication, patients, or their families to
obtain information about use of aid-in-dying medication."[23]  While the law before the 2024
amendments always required the provider to submit the patient's written request and the
consulting medical doctor's written confirmation for every case, the CDPHE report for 2023
shows that patient's written requests were missing in 13 cases and the consulting provider's
written confirmation were missing in 16 cases, but the toxic prescription designed to facilitate
suicide was apparently provided to the patients despite the failure of the provider to comply with

_____

[23] *Colorado End-of-Life Options Act, 2024 Data Summary, with 2017-2024 Trends and Totals*,
Center for Health and Environmental Data, Colo. Dep't of Public Health and Env't, 1,
https://drive.google.com/file/d/1S3yC6qkS15rywRVUhV_J6CuD3202k2nZ/view.

the law.[24]  CDPHE thus has in its possession information showing the identity of 29 patients who were at grave risk of suicide who received their prescriptions from providers in 2023 without full compliance with EOLOA but is apparently taking no action whatsoever to investigate or follow up to protect the lives of those patients.

65.    The provider may not administer the drugs; the law states that the patient must self-administer but does not provide for oversight at the time of administration.  Colo. Rev. Stat. Ann. § 25-48-101 -- 25-48-124.  There are no witness requirements at time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death.  There is no way of knowing whether the drugs were actually administered voluntarily or without coercion, whether the patient's judgment was impaired at the time of ingestion, whether the patient is still "terminal" at the time of ingestion, or if they pursued treatment or cured their condition but chose to ingest the drugs anyway.  The Act does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, physician, other healthcare provider, or friend) administered the medication or physically assisted the person. The time that the person ingests the lethal drugs may be days, weeks, months, or even years after the request for assisted suicide was approved.

66.    The Act then requires that coroners misrepresent the cause of death and omit suicide.  Colo. Rev. Stat. Ann. § 25-48-109(2) ("When a death has occurred in accordance with

---

[24] *Id.* at 9.

this article, the cause of death shall be listed as the underlying terminal illness and the death does

not constitute grounds for post-mortem inquiry under section 30-10-606(1), C.R.S.").

67.    Colorado criminal law contains many protections for older people, dependent

adults, and persons with disabilities, stating that "penalties for specified crimes committed

against [them] should be more severe than the penalties for the commission of the same crimes

against other members of society."  Colo. Rev. Stat. Ann. § 18-6.5-101.  Colorado law makes it

unlawful for caregivers to fail to report known or suspected incidents of abuse of older or

dependent adults.  Colo. Rev. Stat. Ann. § 18-6.5-108.

68.    However, these laws are not enforced against doctors and nurses who prescribe

assisted suicide to people with life-threatening or "terminal" disabilities —even if their doctor

prescribes drugs that result in a distressing or botched suicide attempt, or are ultimately

administered by another person.  EOLOA permits prosecution for violations of its procedures,

but the Act does not require anyone to report violations or require any state agency to investigate

or any law enforcement agency to prosecute violations.  *See* Colo. Rev. Stat. Ann. § 25-48-111;

Colo. Rev. Stat. Ann. § 25-48-119.  The Colorado Adult Protective Services, charged with

investigating allegations of physical abuse, caretaker neglect, exploitation and harmful acts and

self-neglect of at-risk adults, specifically exempts EOLOA from its definition of possible

neglect.[25]

69.    Physicians in Colorado have a duty to provide health care that falls within what is

---

[25] 12 Colo. Code Regs. § 2518-1-30.100 (2024) ("In addition to those exceptions identified
above, access to Medical Aid in Dying, pursuant to Title 25, Article 48, C.R.S., shall not be
considered self-neglect.")

known as the "standard of care."  Colorado's civil jury instructions define the standard of care as

that exercised by a "reasonably careful physician[ ]."[26]  For persons without life-threatening

disabilities Colorado law imposes a standard of care requiring providers to respond to suicidal

wishes in a way that protects the person's life.  The Elder Abuse Act also permits private civil

enforcement of laws that protect against abuse and neglect of older or dependent adults.  *See,*

*e.g.*, Colo. Rev. Stat. Ann. § 13-14-104.5.  However, under EOLOA, providers cannot be subject

to civil or criminal liability, or professional disciplinary action if they meet the exceptionally low

standard of "good faith" observance of EOLOA's minimal documentation requirements.  Colo

Rev. Stat. § 25-48-116(1).  Additionally, complying with a request under the Act for lethal drugs

cannot "constitute neglect or elder abuse for any purpose of law" if the provider acts in good

faith compliance with the Act.

     70.    The American College of Physicians and the American Medical Association

oppose physician-assisted suicide.[27]  The purported safeguards in the EOLOA are illusory,

frequently disregarded, and/or circumvented in ways that harm and discriminate against people

with life-threatening disabilities.

     71.    For years, the number of people using and dying by suicide facilitated by the Act

has been consistently growing.  The year 2023 showed a 22% increase in the number of

---

[26] Colo. Jury Instr., Civil 15:2.

[27] *See* Lois Snyder Sulmasy & Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, 167 ANNALS INTERN. MED. 576 (2017), https://www.acpjournals.org/doi/full/10.7326/M17-0938.  On June 9, 2025, the American Medical Association reaffirmed its long-standing opposition to assisted suicide, https://patientsrightsaction.org/ama-reaffirms-opposition-to-assisted-suicide/ .

prescriptions written compared to those written in 2022.[28]   The increase from 2023 to 2024 was
28%.[29]

### IV.    People with Life-Threatening Disabilities

72.    All people in Colorado who qualify for EOLOA by having a "terminal illness"
have conditions that qualify as disabilities under the ADA and Section 504.  Under EOLOA,
"terminal illness" means "an incurable and irreversible disease that has been medically
confirmed and will, within reasonable medical judgment, result in death within six months."
Colo Rev. Stat. § 25-48-102(16).  All "terminal illnesses" under EOLOA are also disabilities
under the ADA and Section 504 because they are physical impairments that substantially limit
major life activities including operation of major bodily functions, including but not limited to,
functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological,
brain, respiratory, circulatory, endocrine, and reproductive functions.  42 U.S.C. § 12102(2)(B).
These conditions also substantially limit people in other major life activities including caring for
oneself, performing manual tasks, eating, sleeping, walking, and breathing as defined in 42
U.S.C. § 12102(A).  EOLOA is thus available only to people with disabilities.

**Spinal Cord Injuries**

73.    As the term suggests, a spinal cord injury involves damage to the spinal cord.[30]

---

[28] Colorado End-of-Life Options Act, 2023, Colorado Department of Public Health and
Environment, at 3, available at https://cdphe.colorado.gov/center-for-health-and-environmental-
data/registries-and-vital-statistics/medical-aid-in-dying#Annual

[29] Colorado End-of-Life Options Act, 2024, Colorado Department of Public Health and
Environment, at 2, available at https://cdphe.colorado.gov/center-for-health-and-environmental-
data/registries-and-vital-statistics/medical-aid-in-dying#Annual

[30] Spinal Cord Injury – Symptoms and Causes, Mayo Clinic, *available at*
(footnote continued)

Depending on the location and severity of the spinal cord damage, spinal cord injuries can result

in loss of feeling and movement in the legs, pelvis, trunk, and arms.  Spinal cord injuries can also

result in spasms, loss of bladder control, pain, changes in sexual function, and trouble breathing,

coughing, or clearing secretions from the lungs.

74.    Spinal cord injuries are not ordinarily considered "terminal" given available

treatments, but spinal cord injuries can and do qualify for assisted suicide.  Patients with spinal

cord injuries qualify as "terminal" because their injury will often result in death without surgery

and/or supportive services.  Furthermore, some spinal cord injuries result from other terminal

conditions such as cancer.

75.    People with spinal cord injuries are at a greater risk of suicide relative to the

general population, especially when first adjusting to living with a spinal cord injury.  Many

newly injured individuals experience depression and suicidal thoughts as they navigate adapting

to a new future.  Additionally, people with visible disabilities such as spinal cord injuries are

more likely to be perceived as terminally ill and therefore particularly vulnerable to being steered

towards assisted suicide in a state of initial despair or depression shortly after their original

injury.

**Eating Disorders**

76.    Eating disorders may involve avoiding or restricting intake of food (anorexia),

and/or taking measures to expel ingested calories, such as inducing vomiting (bulimia).  People

with eating disorders are persons with disabilities under the ADA and Section 504 because eating

https://www.mayoclinic.org/diseases-conditions/spinal-cord-injury/symptoms-causes/syc-20377890#:~:text=Overview,the%20site%20of%20the%20injury (last visited March 25, 2025).

disorders involve mental and physical impairments that substantially limit not only the major life

activity of eating itself, but all of the other major life activities that depend on a reasonable level

of nutrition.

77.     An estimated ten percent of Coloradans have eating disorders.[31]  As of 2015,

Colorado had the fifth-highest rate of eating disorders among adolescents in the United States.[32]

Teenagers are suffering from eating disorders at a younger age and more severely than ever

before.[33] From 2018 to 2022, eating disorder-related health visits jumped 107.4% for people

younger than 17.[34]  Health organizations declared a national emergency in 2021 due to the

increase in prevalence of mental health disorders in young people, including eating disorders.[35]

Eating disorders also increased in 2020 for adults 30 years old and younger in Colorado. [36]

78.     Eating disorders are themselves a form of mental illness, to which the Diagnostic

---

[31] Hannah Metzger, *As 1 in 10 Coloradans experience eating disorders, lawmakers consider action*, Colorado Politics (Mar. 18, 2023), https://www.coloradopolitics.com/legislature/restrict-sale-diet-pills-minor-colorado/article_f9aee134-c221-11ed-984e-47ba3f08f1eb.html.

[32] CBS News Colorado, *Colorado Ranks High in Adolescent Eating Disorders, Stereotypes Still Persist*, (Mar. 17, 2015), https://www.cbsnews.com/colorado/news/colorado-ranks-high-in-adolescent-eating-disorders-stereotypes-still-persist/.

[33] Caroline Hopkins, *Eating disorders among teens more severe than ever*, NBC News (April 29, 2023), https://www.nbcnews.com/health/health-news/eating-disorders-anorexia-bulimia-are-severe-ever-rcna80745.

[34] *Id.*

[35] Lakshmi Radhakrishnan et al., *Pediatric Emergency Department Visits Associated with Mental Health Conditions Before and During the COVID-19 Pandemic – United States, January 2019 – January 2022*, Centers for Disease Control and Prevention (Feb. 25, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7108e2.htm.

[36] Jennifer Mulson, *Eating disorders in Colorado teens, young adults rose during pandemic*, The Denver Gazette, (Oct. 11, 2022), https://gazette.com/health/eating-disorders-in-colorado-teens-young-adults-rose-during-pandemic/article_f0a58e26-3aae-11ed-a340-df0ded8b6982.html.

and Statistical Manual of Mental Disorders (DSM-IV) devoted an entire chapter.[37]  Co-morbidity between eating disorders and other mental illnesses is high—with over half of the people with anorexia meeting the criteria for anxiety disorders, mood disorders, impulse control disorders, or substance abuse disorders.[38]  Co-morbidity is even higher for bulimia, with over 90% of people with bulimia having another mental illness.[39]  The Academy for Eating Disorders considers anorexia nervosa and bulimia nervosa as well as their variants to be "biologically based, serious mental illnesses (BBMI) that warrant the same level and breadth of health care coverage as conditions currently categorized in this way (e.g., schizophrenia, bipolar disorder, depression, obsessive-compulsive disorder)."[40]  BBMIs impair judgment.[41]

79.     Decision-making in patients with eating disorders is significantly altered.[42] One of the hallmark symptoms of an eating disorder is "[t]he delusional level of cognitive distortions regarding food and body image [which] is the irrational lens through which the decision to refuse

---

[37] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 539-50 (4th ed. 1994).  The more recent DSM-5-TR includes Anorexia Nervosa and Bulimia Nervosa in the overall chapter on Feeding and Eating Disorders.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 381-92 (5th ed. text rev. 2022).

[38] National Institute of Mental Health, *Eating Disorders*, https://www.nimh.nih.gov/health/statistics/eating-disorders (last visited March 26, 2025).

[39] *Id.*

[40] Klump et al., *Academy for Eating Disorders Position Paper: Eating Disorders Are Serious Mental Illnesses*, 42 Int'l J. Eating Disorders 97 97 (2009), https://evelyntribole.com/wp-content/uploads/AED-Eating-Disordrs.Mental-Illness.pdf.

[41] *Id.* at 98.

[42] S Guillaume et al., *Impaired decision-making in symptomatic anorexia and bulimia nervosa patients: a meta-analysis*, 45 PSYCHOLOGICAL MEDICINE 3377, 3377 (2015), https://pubmed.ncbi.nlm.nih.gov/26497047/.

treatment and to seek MAID [Medical Aid in Dying] is filtered."[43] Individuals almost always

regain decisional capacity with weight restoration.[44] Treatments for eating disorders include

psychotherapy, medical care and monitoring, nutritional counseling, and medications.[45]

80.    People with eating disorders are at a higher risk of suicide and suicide is a leading

cause of death for people with anorexia.[46]  A guide to best practices for medical care for eating

disorders authored by the Academy for Eating Disorders instructs medical professionals to

"[a]lways assess for psychiatric risk, including suicidal and self-harm thoughts, plans and/or

intent."[47]

81.    The concept of "terminal anorexia" first emerged in a journal article in 2022.[48]

Since then, other eating disorder experts have criticized the diagnosis as an invalid construct that

---

[43]  Patricia Westmoreland et al., *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, Psychiatric Times (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying.

[44] *Id.*

[45] National Institute of Mental Health, *Eating Disorders: What You Need to Know* 6 (2024), https://www.nimh.nih.gov/health/publications/eating-disorders#:~:text=Commoneatingdisordersincludeanorexia,differentbutsometimesoverlappingsymptoms.

[46] *Id.* at 3.

[47] Academy for Eating Disorders, *Eating Disorders: A Guide to Medical Care* 18 (4th ed. 2021), https://higherlogicdownload.s3.amazonaws.com/AEDWEB/27a3b69a-8aae-45b2-a04c-2a078d02145d/UploadedImages/Publications_Slider/2120_AED_Medical_Care_4th_Ed_FINAL.pdf.

[48] Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal anorexia nervosa: three cases and proposed clinical characteristics*, J Eating Disorders, (Feb. 15, 2022) at 1, https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3.

cannot be adequately defined.[49]  First, the diagnosis of terminal anorexia is precarious given the inherent nature of the illness and its treatability.  People can, and frequently do, recover from anorexia, and there is no clinical evidence to indicate who will recover and who will not.  Further, the ambivalence or complete opposition to treatment that is common with individuals with eating disorders suggests that many individuals will not have engaged with treatment options before turning to physician-assisted suicide.

82.    Prescribing life-ending drugs to a person with severe anorexia without a mental health assessment is tantamount to "colluding with the disease itself."[50]  A person with anorexia described the impact of this shift as follows: "When I was diagnosed with anorexia, the prognosis was bleak — I was told full recovery was near impossible. I began researching methods to take my own life, including countries that had legalized euthanasia and medical aid in dying.  I can only imagine if my diagnosis had included the word 'terminal.' Only I don't imagine.  I know.  I would be dead."[51]

83.    EOLOA requires some record keeping of the types of illnesses for which doctors prescribe lethal drugs.  The records do not call out anorexia separately but include it among

---

[49] Patricia Westmoreland et al., *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, Psychiatric Times (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying (citing a longitudinal study finding that two-thirds of individuals with anorexia nervosa recovered after 22 years).

[50] *Id.*

[51] Chelsa Roff & Catherine Cook-Cottone, *The Dangers of Assisted Suicide To Those With Eating Disorders*, Eat Breathe Thrive 5 (Sept. 16, 2024), https://static1.squarespace.com/static/58e4b708f5e2312cc949b8b4/t/66e828dde88bf757b8f0acc3/1726490860329/Assisted+Suicide+in+Eating+Disorders+Report+-+US+Version.pdf.

"other illnesses/conditions." The most recent EOLOA report lists seventy-five deaths from 2017

to 2024 as falling in the "other illnesses/conditions" category and state officials have "noted a

growing number of cases for which the terminal condition was identified as 'severe protein

calorie malnutrition.'"[52] Thirty cases were reported between 2021 and 2024 — including

eighteen in 2024 alone — compared to zero cases in previous years.[53]

84.     Jane, a twenty-nine-year-old woman, was provided with lethal drugs under

EOLOA while in the midst of a mental health crisis.  Jane was diagnosed with an eating disorder

at age fourteen and received treatment for most of her life.

85.     During one of Jane's hospitalizations in Colorado, Jane's parents were informed

that Jane's providers had placed her on hospice care and had participated in the process of

providing lethal drugs to Jane under EOLOA.  Jane's father intervened as legal guardian, and a

Colorado court ordered the medications removed from Jane's possession.  Jane was subsequently

discharged from hospice and recovered.  Notably, at the time Jane was approved as eligible for

assisted suicide she was being discharged from hospice due to the fact she was no longer eligible

for hospice services.  In addition, the hospice had also determined that she was no longer

competent to consent to medical treatments.  Regardless, her Colorado physicians still found her

eligible for assisted suicide and provided the prescription.  But for the intervention of her parents

---

[52] Chelsea Roff & Catherine Cook-Cottone, *Assisted death in eating disorders*: a systematic review of cases and clinical rationales, FRONTIERS IN PSYCHIATRY, July 31, 2024 at 10, https://pmc.ncbi.nlm.nih.gov/articles/PMC11322357/.

[53]  Colorado Department of Public Health and Environment, Colorado End-of-Life Options Act-Year Eight: 2024 Data Summary, with 2017-2024 Trends and Totals 9 (2024), https://cdphe.colorado.gov/center-for-health-and-environmental-data/registries-and-vital-statistics/medical-aid-in-dying#Annual.

and the Court, she may have ended her life under EOLOA.  She subsequently lived

independently for two years, working as an Occupational Therapist, purchasing a home,

travelling on vacation, and making new friends.  She died in May 2024 while hospitalized  for a

heart condition.

86.     Like Jane, Plaintiff Mary Gossman has struggled with eating disorders and

depression through most of her life which have led to two hospitalizations.  The first time she

was hospitalized, she was told that she could die within weeks because her heart was failing, and

her treatment team told her there was nothing more they could do for her.  Her former

psychiatrist, who initially recommended hospitalization, had also repeatedly told her she was

running out of options regarding medication and treatment for her depression.  These comments

led her to feel demoralized, abandoned, and discouraged, especially when she was told after her

second hospitalization that she was at a high risk of relapse.  At the time, she was trying to die

through her anorexia and would have accepted assisted suicide had it been offered to her.  Had

she done so, she would have never found treatments that worked, recovered, and ultimately met

her husband who she is currently building a life with.

87.     Persons with anorexia have been offered life-ending drugs under EOLOA and one

described her experience as follows: "I was told that, although I wasn't yet 30 years old at the

time, [my doctor] would 'make an exception' for me and 'allow' me to die, if that was my

choice.  It didn't feel like my choice — I felt coerced... I'm not sure how to describe it, but

something inside me wouldn't let me take the MAiD."[54]

---

[54] Chelsa Roff & Catherine Cook-Cottone, *The Dangers of Assisted Suicide To Those With Eating Disorders*, Eat Breathe Thrive 5 (Sept. 16, 2024),
(footnote continued)

V.    **Defendants Deny People with Life-threatening Disabilities Equal Access to State-Based Programs and Services, in Violation of the ADA, Section 504, and Equal Protection Clause.**

A.    **Defendants Administer an Unequal Two-Track System of Suicide Prevention Services, with One Track for People with Certain Disabilities and a Separate Track for All Others.**

88.    Defendant CDPHE receives federal funds to administer suicide prevention

initiatives in Colorado and is responsible for providing suicide prevention services, including by

providing resources to counties for suicide prevention trainings and programs as well as by

connecting individuals in crisis to immediate assistance through its Office of Suicide Prevention.

89.    Colorado law mandates that people who are an imminent danger to themselves are

connected to mental health services.  Colo. Rev. Stat. Ann. §§ 27-65-101 to -131.  When a

person in Colorado who does not have life-threatening disabilities expresses suicidal intentions

to a physician or nurse, the standard of care requires the above suicide prevention programs,

services, and/or activities to be made available to the person.  If that person does not pursue

those resources and maintains an interest in suicide, the standard of care is not to help the patient

kill himself, nor to leave him or her to their own devices.  Instead, an entire system of prevention

measures is deployed around the person including, if necessary, emergency behavioral health

services and/or inpatient programs.

90.    Defendant State agencies and officials are aware of the heightened risk factors

associated when a person has a life-threatening disability, and requests assisted suicide—

including the fact that such a person likely has depression that impairs the person's ability to

https://static1.squarespace.com/static/58e4b708f5e2312cc949b8b4/t/66e828dde88bf757b8f0acc3/1726490860329/Assisted+Suicide+in+Eating+Disorders+Report+-+US+Version.pdf.

make informed decisions—yet such State agencies fail to ensure that the suicide prevention

programs that they develop and administer are equally available to those individuals. Under

EOLOA, Defendants permit the withholding of suicide prevention services and interventions

when the person has a life-threatening disability. In a 2019 letter to the U.S. Department of

Health and Human Services, the National Council on Disability described this situation as "a

double standard in suicide prevention efforts" given that people with life-threatening disabilities

"are not referred for mental health treatment when seeking assisted suicide, while people without

disabilities receive such referrals."[55]

91.     By relegating people with life-threatening disabilities to a less effective, unequal,

and separate program for people expressing suicidal ideation, EOLOA: (1) "den[ies] qualified

individual[s] with [] disabilit[ies] the opportunity to participate in or benefit from" behavioral

health programs, including suicide prevention, hospitalization, and medication services, in

violation of 28 C.F.R. § 35.130(b)(1)(i); (2) affords qualified individuals with disabilities an

opportunity "that is not equal to that afforded others" or that is not as "effective in affording

equal opportunity to … gain the same benefit … as that provided to others," in violation of 25

C.F.R. § 35.130(b)(1)(ii)-(iii); and (3) provides "different or separate aids, benefits, or services"

to people with disabilities in a manner that does not "provide qualified individuals with

disabilities with aids, benefits, or services that are as effective as those provided to others" in

violation of 28 C.F.R. § 35.130(b)(1)(iv).

---

[55] Letter from Neil Romano, Chairman, Nat'l Council on Disability, to Roger Severino, Director, Off. C.R., U.S. Dep't of Health and Human Servs. (Dec. 11, 2019), (https://www.ncd.gov/letters/2019-12-11-ncd-letter-to-hhs-on-assisted-suicide-medical-futility-and-qalys-reports/).

B.    **The Colorado Medical Board and its President Deny People with Life-Threatening Disabilities the Medical Licensing and Regulatory Protections Available to Others.**

92.    The U.S. Supreme Court recognizes that the State "has an interest in protecting the integrity and ethics of the medical profession."[56]  Defendant CMB and CMB President, Roland Flores, protect health care consumers through the proper licensing and regulation of physicians and certain allied health care professionals through the vigorous, objective enforcement of the Medical Practice Act, as well as by ensuring quality medical care through licensing and regulatory functions.  By law, the highest priority of the CMB in its regulatory and disciplinary functions is the protection of the public.  EOLOA, however, eliminates CMB's patient protections for people with life-threatening disabilities.

93.    The CMB is charged with enforcing the disciplinary and criminal provisions of the Colorado Medical Practice Act, and as part of that role is charged with promulgating rules, making investigations, holding hearings, and taking evidence and "aid[ing] law enforcement in the enforcement of this article 240 and in the prosecution of all persons, firms, associations, or corporations charged with the violation of any of its provisions."  Colo. Rev. Stat. Ann. § 12-240-106.

94.    Under EOLOA, Plaintiffs and other individuals with life-threatening or "terminal" disabilities are denied the equal benefit of CMB's protections.  The Act prohibits the CMB from imposing any discipline on doctors who prescribe lethal drugs under EOLOA, even though the doctor knows that the patient is suicidal.  Colo. Rev. Stat. Ann. § 25-48-116.  Once the person is

---

[56] *Glucksberg*, 521 U.S. at 731 (citing American Medical Association, Code of Ethics § 2.211 (1994) ("[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer.").

identified as having a life-threatening or "terminal" disability, the disciplinary safeguards

provided by the Medical Practice Act are eliminated.  *See id.*

95.     Plaintiffs are informed and reasonably believe and, on that basis, allege that the

CMB has not undertaken any investigations of complaints or conducted any disciplinary

proceedings against a healthcare professional in Colorado based on their prescribing of lethal

medications pursuant to EOLOA.  In October 2021, in response to a request for public records

relating to any investigations into non-compliance, including with licensing boards, Defendant

CDPHE responded that it had "no records responsive to your request."  In a follow-up

communication in February 2022, Defendant CDPHE further clarified that, "unlike other states

with similar laws, Colorado collects limited data under the End-of-Life Options Act, and the

information that is collected is included in annual statistical reports."

## VI.     EOLOA Unlawfully Steers People with Life-Threatening Disabilities Toward Suicide.

96.     EOLOA unlawfully and irrationally discriminates by steering people with life-

threatening disabilities towards assisted suicide and all others towards life-preserving suicide

prevention treatment services.

97.     Steering has the further effect of subjecting people with life-threatening

disabilities to coercion and undue influence—depriving individuals of a truly voluntary and

informed waiver of their right to live.  Likely under the influence of depression and decreased

decision-making capacity, a person evaluating assisted suicide may be highly influenced by

others' opinions about whether they should go forward with the act.  Insurers, hospitals, nursing

homes, physicians, other healthcare providers, and even family members all have their own

perspectives and unique, conflicting incentives that inevitably help shape the person's ultimate

decision.  People with life-threatening disabilities are particularly susceptible to undue influence from these stakeholders, who may directly or indirectly pressure them to obtain assisted suicide for the stakeholder's own convenience, financial gain, or other interest at odds with keeping the person alive.

98.    Most people in the elder community will experience a chronic disability or disease at the end of their lives and require extra care to safely remain in their homes.  But if that care is not made available and an individual's only alternatives to assisted suicide are waiting for a nursing home placement, burned-out or unavailable family care, or suffering in isolation, assisted suicide can become a seemingly preferable option.

99.    EOLOA presents a false choice between obtaining end-of-life care or assisted suicide.  The system is rigged to make assisted suicide the *only* viable option.  Life-sustaining treatment, long-term supportive services, in-home nursing services, palliative care, and hospice may be unavailable (or denied) due to a variety of reasons—including Defendants' system of setting health care priorities.  The Act does nothing to require that sufficient long-term care is available to the person, and exhausted or knowingly rejected, so that they can make an informed choice between assisted suicide and continuing to live with some semblance of independence. Assisted suicide reduces pressure on Defendant State agencies and actors to supply support services that enable people with life threatening disabilities to make a *meaningful* choice between options that exist.  True autonomy presupposes having access to real options and being empowered to choose from among them.

100.    EOLOA extends personal "freedom" only to the decision to die by assisted suicide.  Defendants fail to ensure availability of *any* of the "feasible alternatives" the attending

provider is supposed to review with the patient.  *See* Colo. Rev. Stat. Ann. § 25-48-102(5)(d) ("'Informed decision' means a decision that is made after the attending provider fully informs the individual of all feasible alternatives or additional treatment opportunities, including comfort care, palliative care, hospice care, and pain control.").  Under the Act, there is no freedom to continue living in one's own home with adequate supportive services, and no requirement that such services be offered or knowingly rejected as a less restrictive alternative to death.

101.    EOLOA purports to prohibit insurance steering.  It bars health insurers from using "an individual's act of making or rescinding a request for medical aid-in-dying medication" in the "sale, procurement, or issuance of, or the rate charged for, any life, health, or accident insurance or annuity policy."  Colo. Rev. Stat. Ann. § 25-48-115(1).  It also specifies that utilizing EOLOA "does not affect a life, health, or accident insurance or annuity policy."  *Id.* § 25-48-115(2).  In addition, the Act states that an "insurer shall not deny or otherwise alter health-care benefits available under a policy of sickness and accident insurance to an individual with a terminal illness who is covered under the policy, based on whether" an individual uses EOLOA. *Id.* § 25-48-115(3).

102.    Despite these provisions, the Act does nothing to ensure that insurers do not deny or delay approval of life saving or life extending therapies, while at the same time covering the costs of assisted suicide.  Direct coercion is not necessary where "patients are denied necessary life-sustaining health care treatment, or even if the treatment they need is delayed[;] many will, in effect, be steered toward assisted suicide."[57]

---

[57] DREDF, *Why Assisted Suicide Must Not Be Legalized* section I(C)(1) (Oct. 12, 2012), https://dredf.org/public-policy/assisted-suicide/why-assisted-suicide-must-not-be-
(footnote continued)

103.    Having one's own doctor or advanced practice nurse encourage or even agree
with the choice to use physician-assisted suicide is a powerful factor in support of that
decision.[58]  Research has shown that doctors' own discomfort with people with life-threatening
disabilities can influence the person's request to hasten death.  A study from Georgetown
University's Center for Clinical Bioethics found a strong link between cost-cutting pressure on
physicians and their willingness to prescribe lethal drugs to patients.[59]  For hospitals, nursing
homes and hospices, it is much less expensive to assist a person's suicide than it is to provide for
care.

104.    Healthcare providers' subjective value judgments about their patient's quality of
life also lead to recommendations of assisted suicide as a way to address perceived low-quality
of life.  Some healthcare providers possess a "false empathy" towards their patients, believing
that a person with a life-threatening disability is better off dead than alive without inquiring into
the quality of life available with adequate supportive services or even the barriers to accessing
supportive services.  Moreover, physicians often receive little training in quality-of-life
interventions that can make continued life more desirable.[60]

105.    People who die by assisted suicide often cite the burden on family caregivers as a
contributing factor.  Family members and other caregivers involved in decisions about assisted

---

legalized/#marker13 [https://archive.is/jA8yh].

[58] *See, e.g.*, Steven H. Miles, *Physicians and Their Patients' Suicides*, 271 JAMA 1786 (1994).

[59] DREDF, *supra* note 52 (citing Daniel P. Sulmasy et al., *Physician resource use and willingness to participate in assisted suicide*, 158 JAMA INTERN. MED. 974, 978 (1998).)

[60] Nat'l Council on Disability, *The Danger of Assisted Suicide Laws* 10, 33-34 (Oct. 9, 2019), https://www.ncd.gov/report/the-danger-of-assisted-suicide-laws/.

suicide have tremendous influence and can distort patient choice, based in part on their own

anxiety, depression, and burnout from caring for a person with a life-threatening disability.

Family members who find it difficult to accept functional impairments in a loved one and/or are

motivated by a desire to end perceived or actual suffering may—intentionally or unintention-

ally—convey the idea that the everyone would be better off if the patient were to accept assisted

suicide.

106.    Some people who die by assisted suicide identify the financial implications of

treatment as a reason for requesting lethal drugs.  The high cost of continuing medical care for

people with cancer and other life-threatening disabilities can drain a family's savings, even with

insurance.[61]  People with life-threatening disabilities may experience overt pressure from family

members concerned about mounting bills as well as their own internalized guilt that they will be

incapable of leaving sufficient money or property to their next of kin—or worse, saddling them

with unpaid healthcare costs.[62]

**VII.    EOLOA Draws an Irrational Distinction Between People with Life-Threatening
        Disabilities and Everyone Else.**

   **A.    There Is No Rational Basis for the Act's "Terminal Illness"
          Classification.**

107.    The Act does not reasonably advance its claimed purposes of enabling

autonomous choices in dying and relieving suffering.  EOLOA does not grant all Coloradans the

---

[61] John G. Cagle et al., *Financial burden among US households affected by cancer at the end of
life*, 25 PSYCHOONCOLOGY 919 (2016),
https://onlinelibrary.wiley.com/doi/abs/10.1002/pon.3933.

[62] Ezekiel J. Emanuel et al., *Understanding Economic and Other Burdens of Terminal Illness:
The Experience of Patients and Their Caregivers*, 132 ANNALS INTERNAL MED. 451 (2000),
https://www.acpjournals.org/doi/10.7326/0003-4819-132-6-200003210-00005.

freedom and liberty to die by assisted suicide, and there is no rational relationship in the Act

between autonomy and certain physical disabilities with unreliable prognoses.  The only other

justification proffered by the law's author is to ease suffering.  But the fit between suffering and

those with "terminal" disabilities is also poor.  Many non-terminal people suffer from pain but

are ineligible for assisted suicide under the Act.  Likewise, many non-terminal people fear losing

autonomy, dignity, control of bodily functions, becoming a burden on caregivers, and/or the

financial costs associated with continued living—but are nevertheless ineligible to participate in

EOLOA.

108.    Some people with life-threatening disabilities have impaired judgment and yet

express a wish to die.  Their status is incompatible with autonomy and personal decision-making.

When people with life-threatening disabilities are provided lethal drugs, there is a potential for

exposing individuals to deadly mistakes and abuses.  EOLOA fails to contain safeguards

sufficient to justify treating people with life-threatening disabilities differently than others and,

as discussed further *herein*, violates the rights of people with such disabilities to equal protection

under the law.

        **B.**    **EOLOA's Definition of "Terminal illness" is Arbitrary and Includes
People with Life-Threatening Disabilities Who Can Live for Years
with Adequate Treatments and Supports.**

109.    The six-month survival estimate embodied in EOLOA's definition of "terminal

illness" is not rationally related to the Act's stated purposes.  There is no connection between

suffering and the six-month mark.  Palliative care and pain control do not stop working six

months before death.  In addition, people without a terminal disease also can suffer from pain.

110.    Physicians and advance practice nurses are not trained, equipped, or otherwise

capable of predicting with a high degree of reliability, that a particular person with a particular condition will likely die within six months.  The overwhelming research and clinical information demonstrate that predictions of death six months out from the event are inherently unreliable, that physicians and advance practice nurses are not particularly good prognosticators, and that any such prediction is deeply tainted by impermissible stereotypes and discriminatory biases.  A mistakenly grim prognosis may drive people to assisted suicide when they could otherwise live long lives with (or without) treatment.  Spinal cord injury survivors are at times suicidal immediately following their initial injury and qualify as "terminal" because their injury will often result in death without surgery and/or supportive services—but they can and often do live long, happy lives.  Individuals with anorexia or other eating disorders regularly recover and live long lives.  So too with a myriad of disabilities, which, without treatment, rehabilitation, and/or long-term services and supports, are life-threatening, i.e., "terminal" under the Act.  Inaccurate end-of-life predictions are common and dangerous when combined with biases present in the medical profession, and in society at large, that devalue disabled lives.

## VIII.    EOLOA Unconstitutionally Deprives People with Life-Threatening Disabilities of Due Process Protections.

111.    EOLOA lacks sufficient safeguards and unconstitutionally deprives people with life-threatening disabilities of protections for their right to live.  The Act fails to ensure adequate due process for people who waive this constitutional right.  EOLOA fails to require the consideration, exhaustion, and/or knowing rejection of less restrictive, alternatives to assisted suicide.  The Act affirmatively places people with life-threatening disabilities in danger by acting with deliberate indifference to the known, obvious, and foreseeable dangers of making assisted suicide available to those with the highest risk factors for suicide.  Through their acts and

omissions, Defendants fail to ensure that people who die by assisted suicide are provided their

constitutional due process rights and had a *real* end-of-life option.

112.    EOLOA lacks safeguards to protect people from dying by suicide impulsively.

Risk for depression and suicidality is often present immediately after a traumatic injury or grave

diagnosis, including a spinal injury.  A 2023 study of over 16 million people with cancer in the

U.S. found that the "highest suicide risk occurred in the first 6 months after diagnosis, during

which individuals diagnosed with cancer bore more than 7 times the suicide risk of the general

population."[63]

113.    Despite this, in 2024, Defendant Governor Polis signed into law a bill amending

EOLOA by shortening the waiting period from fifteen days to only seven days.[64]  The likelihood

that depression or another disorder that impairs judgment will resolve itself within seven days is

low.  Coloradans can now make an oral request to an attending provider; have their diagnosis,

prognosis, and capacity confirmed by a second consulting provider (who does not have to meet

with the patient in person), and seven days after the first request, ingest lethal drugs prescribed

by the attending provider.  Such a short timeline cannot possibly provide the due process

protections required when such a fundamental right—the right to live and exist in the world—is

at stake.  If the provider determines that the patient has less than forty-eight hours to live, a

determination for which EOLOA provides no guidance, there is no waiting period at all.  Colo.

Rev. Stat. Ann. § 25-48-104(1)(b).  It is in part for these reasons that the American College of

---

[63] Xin Hu et al., *Suicide Risk Among Individuals Diagnosed With Cancer in the US, 2000-2016*,
6 JAMA NETWORK OPEN 1, 9 (2023).

[64] Colo. Rev. Stat. Ann. § 25-48-104(1), *amended by*, SB24-068, 75th Gen. Assemb., 2024 Reg.
Sess. (Colo. 2024).

Physicians and the American Medical Association oppose physician-assisted suicide.  The

purported safeguards are illusory, frequently disregarded, and/or circumvented in ways that harm

and discriminate against people with life-threatening disabilities.  The EOLOA system as

amended constitutes a State-created danger of death for persons considering suicide who could

otherwise survive their immediate crisis and enjoy years of life.

          **A.**       **EOLOA's Vague Definition of "Terminal illness" Fails to Ensure an Adequate Process to Determine Assisted Suicide Eligibility.**

      114.    The statutory definition of "terminal illness" is overbroad and encompasses the

class of persons who have medical conditions that would result in death within six months

*without* medical care but who can live for more than six months *with* medical care.  By leaving

this key term vague and unclear, EOLOA fails to define the class of persons eligible for assisted

suicide with precision and fails to provide adequate guidance to the State's healthcare providers

eligible to prescribe life-ending drugs under EOLOA as to how to determine whether a patient's

condition meets the principal eligibility criteria.  The category of people with "terminal illness"

is inherently ambiguous and unstable.

      115.    Providers are notoriously poor prognosticators regarding the timing of their

patients' deaths.  By failing to rely on any criteria or methodology to determine length of

remaining life with any level of precision, and by failing to provide any guidance to the State's

physicians and advance practice nurses as to how to determine whether a particular person's

condition will or will not "result in death within six months" (with or without medical care),

EOLOA sweeps in untold numbers of individuals whose conditions will (and do) not result in

death within six months.

      116.    The lack of clarity surrounding the process for determining who is eligible for

State-sanctioned assisted suicide places individuals' lives at great risk from the unaccountable

discretion and potential biases of individual doctors, and risks depriving individuals without

decision-making capacity of the due process required by the U.S. Constitution.

        **B.**      **No Meaningful Mental Health Assessment or Treatment Is Required Under the Act.**

117.    EOLOA's lack of safeguards with respect to people with life-threatening

disabilities, people who are already at a heightened risk of suicide, deprives people of life

without due process of law.

118.    Depression plays an enormous role in assisted suicide deaths and all people who

request hastened death should be assessed by a psychiatrist for treatable depression.  Most people

diagnosed as terminally ill who express a desire to die are indirectly asking for help in dealing

with the depression and accompanying concerns common to all people involved in challenging

circumstances, particularly those persons nearing the end of their natural lives.

119.    Reduced decision-making capacity also plays an enormous role in deaths pursuant

to EOLOA.  While the Act contains a requirement that the attending provider determine that the

person has mental capacity, defined as the ability to make and communicate an informed

decision to health care providers, "[m]any physicians receive no formal training in capacity

assessment and may hold erroneous beliefs about decisional capacity."[65]  A study published in

the American Journal of Geriatric Psychiatry in 2018 "revealed high rates of decisional impair-

ment in terminally ill participants," and found that although "[m]ost terminally ill participants

---

[65] Elissa Kolva, Barry Rosenfeld, & Rebecca Saracino, *Assessing the decision making capacity of terminally ill patients with cancer*, 26 AM J GERIATRIC PSYCHIATRY 5, 523-31, (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6345171/.

were able to express a treatment choice (85.7%), … impairment was common on the Understanding (44.2%), Appreciation (49.0%) and Reasoning (85.4%) subscales."[66]

120.    In suicide prevention, the standard of care when someone expresses suicidal ideation is to conduct a mental health evaluation to assess the risks, and then to provide treatment.  Defendant State agencies and officials fail to ensure that this standard of care is observed for people who seek assisted suicide from their doctors.  Psychiatrists and psychologists are *almost never* involved in decisions surrounding assisted suicide.  Instead, the attending provider is required to refer the patient for a mental capacity assessment only "if the attending provider observes signs that the individual may not be capable of making an informed decision"[67]—but the Act does not provide any standards to guide physicians and advance practice nurses in making these observations, nor does it require training in capacity assessment.  Significantly, EOLOA assumes that a request for assisted suicide is *not* an indication of a mental disorder, when other Colorado laws make precisely the opposite assumption for virtually everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition.  Few, if any, people who are provided assisted suicide under Colorado's EOLOA are referred for "mental capacity" assessments before receiving lethal prescriptions.  Colorado's 2024 Data Summary Report on the usage of EOLOA reported that there were only ten recorded confirmation forms from mental health providers in seven years provided to the State out of a total of 1676 attending/prescribing

---

[66] *Id.*

[67] Colo. Rev. Stat. Ann. § 25-48-106(1)(f); *see also id.* § 25-48-108.

physician forms.[68]  In fact, there were no referrals at all for 2021 and 2023 and only two in 2024.

Even when a person *is* referred to a mental capacity assessment under EOLOA, the provider's

inquiry is limited to determining "whether the individual is mentally capable" to use EOLOA.

Colo. Rev. Stat. Ann. § 25-48-108(2)–108(3).  In a study of Oregon's assisted suicide law, more

than half of psychiatrists surveyed reported that they were "not at all confident that they could, in

the context of a single consultation, determine if a mental disorder or depression impaired the

judgment of a person requesting assisted suicide."[69]

121.    Upon information and belief, people have died by assisted suicide in Colorado

after being found not eligible for hospice on the grounds of have more than six months to live,

and after doing enough doctor-shopping to find two providers who, based on brief consultations,

were willing to certify the patient for EOLOA regardless, and even with clear indications of lack

of capacity.

122.    EOLOA's procedures are insufficient for differentiating between people who

have adequate decision-making capacity and those who do not.

C.    **EOLOA Fails to Include Any Safeguards to Ensure that People Are Not
       Judgment-Impaired or Unduly Influenced at the Time of Death.**

123.    Once a prescription for assisted suicide drugs is provided to the patient, there are

no requirements whatsoever in EOLOA to ensure that the necessary predicates for the provider

---

[68] *See, e.g.*, Colorado Department of Public Health and Environment, Colorado End-of-Life
Options Act-Year Eight: 2024 Data Summary, with 2017-2024 Trends and Totals 9 (2024),
https://cdphe.colorado.gov/center-for-health-and-environmental-data/registries-and-vital-
statistics/medical-aid-in-dying#Annual.

[69] Linda Ganzini et al., *Evaluation of Competence to Consent to Assisted Suicide: Views of
Forensic Psychiatrists*, 157 AM. J. PSYCHIATRY. 595, 595 (2000),
https://ajp.psychiatryonline.org/doi/epdf/10.1176/appi.ajp.157.4.595.

prescribing the lethal medication remain true at a later time when the person may actually decide

to ingest the medication: Is the person under duress, capable of making medical decisions,

suffering from a mental disorder that impairs judgment, still deemed to have a "terminal illness,"

and capable of understanding feasible alternatives?  Ingestion may occur days, weeks, months, or

even years after the request for assisted suicide was approved, during which a predicate's

existence may have changed.

124.    There are no witness requirements at time of ingestion, no requirements that the

attending provider be present or informed of the person's death, and no obligation to inform

authorities of the true manner or cause of death.[70]  There are no requirements that the drugs be

used within days, weeks, months, or years, and neither EOLOA nor Defendants do anything to

ensure that the drugs are safely stored prior to consumption. EOLOA requires that the

medication be properly disposed of should the person not take the medication, but it contains no

reporting requirements and takes no other steps to ensure that relevant parties comply with this

requirement.  This places the requestor and other people in the home—including children—at

risk of suicide, misuse, or accidental ingestion of the drugs.  Accidental ingestions have taken

place in Colorado.[71]

125.    The Act does not require any evidence that the person ingested the lethal drugs

---

[70] In fact, EOLOA requires that coroners misrepresent the cause of death and omit suicide.  Colo. Rev. Stat. Ann. § 25-48-109(2) ("When a death has occurred in accordance with this article, the cause of death shall be listed as the underlying terminal illness and the death does not constitute grounds for post-mortem inquiry under section 30-10-606(1), C.R.S.").

[71] Michael Cook, *Accidents do happen in legal assisted suicide*, BioEdge, (Oct. 12, 2023), https://bioedge.org/end-of-life-issues/assisted-suicide/accidents-do-happen-in-legal-assisted-suicide/.

themselves, that is, whether the person self-administered the lethal drugs as required by the Act

or whether anyone else (family member, nurse, provider, other medical provider, or friend)

administered the medication or physically assisted the person.  Anything other than self-

administration is a violation of the Act, but Defendants do nothing to determine whether this

critical line between suicide and active euthanasia is ever crossed and in implementing and

enforcing EOLOA, Defendants make clear that they do not care or want to know.

> **D.** **EOLOA Fails to Provide Viable Alternatives to Suicide, Fails to Require Consideration or Exhaustion of Less Restrictive Alternatives to Suicide, and Lacks Independent Oversight.**

126.    EOLOA requires the attending provider to inform the patient of the "feasible

alternatives or additional treatment opportunities, including comfort care, palliative care, hospice

care, and pain control" in order to ensure that the patient makes an "informed decision."  Colo.

Rev. Stat. Ann. § 25-48-106(1)(e)(II).  But the Act includes no requirements or guidance

regarding how in-depth or comprehensive this discussion must be, and Defendants fail to provide

any.  Upon information and belief, alternatives to assisted suicide are routinely under-

emphasized or not discussed in any meaningful way and Defendants fail to ensure that any of

these alternatives are actually available.  The EOLOA Form that providers are required to fill out

does not even mention this requirement let alone require the provider to certify compliance.

127.    EOLOA fails to require that people meaningfully consider, exhaust, and/or

knowingly reject less restrictive, truly viable alternatives to assisted suicide, including suicide

prevention services, palliative and/or hospice care, medical and nursing support services, and

other personal support services that are ostensibly included among the "feasible alternatives" that

Colorado providers are supposed to discuss with persons who seek assisted suicide.  The Act

fails to require the provision or exhaustion of the State's suicide prevention program, which is expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people from taking unnecessary, uninformed, untreated, or otherwise preventable suicidal actions.

> E.    **Prescribing Providers Often Lack a Patient-Provider Relationship with the People for Whom They Prescribe Lethal Drugs.**

128.    EOLOA contains no safeguards to ensure that the provider who prescribes lethal drugs have any preexisting relationship with the patient or knowledge of their illness and treatment history.  There is no requirement for the attending provider to request the patient's medical records before assisting their suicide.  The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely, via telehealth consult.

129.    EOLOA operates on the fiction that, on the basis of two visits, or even just phone calls, over seven days, or just one visit if the provider believes the person will die within 48 hours, a provider can: (1) make the terminal prognosis, (2) ensure the patient is not acting under impaired judgment or duress, (3) decide whether to refer the patient for a mental health assessment, and (4) counsel the patient on their options and alternatives.  The lack of an ongoing clinician-patient relationship requirement, moreover, facilitates provider-shopping, by which the patient seeks out a second provider, and in some cases, a third and a fourth "opinion," until one of them eventually agrees to write the prescription.  Defendants make no effort to track or restrict this practice, allowing easy evasion of the "safeguards" against duress, neglect, and abuse.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203)
### (Against All Defendants)

130.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination."  42 U.S.C. § 12132.  A "public entity" includes State and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).

131.    Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.  Defendants provide suicide prevention services and regulation of the medical profession in Colorado.  Suicide prevention services are programs, services, and activities within the meaning of the ADA.  The Colorado Medical Board's regulation of the medical profession and enforcement of rules and laws applicable to medical professionals are also programs, services, and activities within the meaning of the ADA.

132.    The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).  The ADA Amendments Act of 2008 clarified the definition of "major life activities" to also include: "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain,

respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "The

definition of 'disability' … shall be construed in favor of broad coverage … to the maximum

extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A).

133.    Plaintiffs' constituents and/or members include, and Plaintiffs are, qualified

individuals with disabilities as defined in the ADA and ADA Amendments Act of 2008.

Plaintiffs are qualified because they are or represent people with life-threatening disabilities who

both qualify to use EOLOA's procedures to end their lives and qualified to use Defendants'

suicide prevention services.  People with eating disorders who qualify to use EOLOA all have

disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act.  Under

EOLOA, "terminal illness" means "an incurable and irreversible disease that has been medically

confirmed and will, within reasonable medical judgment, result in death within six months."

Colo. Rev. Stat. § 25-48-102(16) (2024).  Eating disorders are also disabilities under the ADA

and Section 504 because they are mental or physical impairments that substantially limit major

life activities of eating and caring for oneself and the operation of major bodily functions

including digestive, bowel, endocrine, and bladder functions.  *See* 42 U.S.C. § 12102(2)(A)-(B).

People with spinal cord injuries who qualify to use EOLOA all have disabilities within the

meaning of the ADA and Section 504 of the Rehabilitation Act.  All spinal cord injuries that

arguably satisfy the definition of "terminal illness" under EOLOA are also disabilities under the

ADA and Section 504 because they are mental or physical impairments that substantially limit

major life activities of walking, standing, lifting, bending, and/or caring for oneself.  *See* 42

U.S.C. § 12102(2)(A).  Plaintiffs are therefore entitled to the protections of the ADA.

134.    Through administering EOLOA, Defendants have excluded persons with life-

threatening disabilities, including but not limited to people with serious eating disorders and

people with spinal cord injuries, from participation in and denied them the benefits of Colorado's

suicide prevention services, programs, and activities and the benefits of the programs, services,

or activities of the Colorado Medical Board's regulation of the medical profession and

enforcement of laws applicable to medical professionals.  Such exclusion and denial of benefits

constitutes discrimination based on disability in violation of 42 U.S.C. § 12132.

135.    Congress directed the Department of Justice to promulgate regulations to

implement Title II's' anti-discrimination provisions.  42 U.S.C. § 12134.  The regulations

provide further clarity regarding what it means to exclude a person from participation in and/or

deny a person the benefits of a program, service, or activity.  Such denial and exclusion can take

the form of affording disabled persons with services that are not equal to those provided to

others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii), or that are

separate unless such separation is necessary to provide an equally effective service, *id.* §

35.130(b)(1)(iv).  EOLOA operates in all these forms to harm persons with life-threatening

disabilities.  EOLOA's rapid pathway to death is a separate, unequal, and less effective way of

responding to suicidality, compared with Colorado's ordinary suicide prevention programs.

EOLOA channels persons with life-threatening disabilities into this separate, unequal and less

effective way of responding to suicidality, hastening deaths that could be avoided for decades.

136.    Furthermore, by carving out physician and advance practice nurse participation in

EOLOA from requirements that otherwise apply to physicians and advance practice nurses

responding to suicidal patients and by failing to investigate any physicians or advance practice

nurses for violating EOLOA, Defendants deny people with life-threatening disabilities the

benefits of Defendants' programs, services, and activities of regulation of the medical profession

and quality of medical care. Accordingly, Defendants have excluded and continue to exclude

Plaintiffs from participation in, and denied them the benefits of, or otherwise discriminated

against them in, Defendants' suicide prevention programs and services in violation of the ADA.

137.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted,

Plaintiffs and their members will suffer irreparable harm in that they will continue to be

discriminated against, denied equal access to the suicide prevention programs and services

operated and overseen by Defendants, and die an unnatural, premature death by suicide.

Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C.

§§ 12101 and 12205.

WHEREFORE Plaintiffs pray for relief as set forth below.

### SECOND CLAIM FOR RELIEF
### (Rehabilitation Act, 29 U.S.C. § 794)
### (Against All Defendants)

138.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in

the preceding paragraphs of this Complaint.

139.    Section 504 of the Rehabilitation Act provides that "no otherwise qualified

individual with a disability in the United States … shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Section 504 is interpreted similarly to the ADA and applies to any entity that receives federal

funds.

140.    At all times relevant to this action, Defendants are and have been recipients of

federal financial assistance within the meaning of the Rehabilitation Act.

141.    An "individual with a disability" is defined under the statute, in pertinent part, as

"an individual [who has] a physical or mental impairment that substantially limits one or more

major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C.

§ 12102).  "Qualified" means, with respect to services, a person who meets the essential

eligibility requirements for the receipt of such services.  28 C.F.R. § 41.32.

142.    Plaintiffs are, or have members or constituents who are, qualified individuals with

disabilities as defined in Section 504 as they have disabilities that substantially limit one or more

major life activities and meet the essential eligibility requirements of both EOLOA and

Defendants' suicide prevention services.  All conditions that arguably satisfy the definition of

"terminal illness" under EOLOA, including but not limited to serious eating disorders and spinal

cord injuries, are also disabilities under Section 504 because they are mental or physical

impairments that substantially limit major life activities.  *See* 42 U.S.C. § 12102(2).

143.    Section 504 defines "program or activity," in relevant part, as "all of the

operations of a department, agency, special purpose district, or other instrumentality of a State or

of a local government; or the entity of such State or local government that distributes such

assistance and each such department or agency (and each other State or local government entity)

to which the assistance is extended, in the case of assistance to a State or local government."  29

U.S.C. § 794(b)(1).

144.    Defendants' suicide prevention services in Colorado are programs or activities

within the meaning of Section 504 of the Rehabilitation Act and must comply with Section 504's

antidiscrimination requirements.  The Colorado Medical Board's regulation of the medical

profession and enforcement of rules and laws applicable to medical professionals are programs,

services, or activities within the meaning of Section 504 of the Rehabilitation Act.

145.    The U.S. Department of Health and Human Services has issued regulations

implementing Section 504 of the Rehabilitation Act applicable to medical care.  These

regulations prohibit discrimination on the basis of disability in medical treatment.  45 C.F.R. §

84.56(a).  These regulations specifically prohibit covered entities from "[providing] a medical

treatment to an individual with a disability where it would not provide the same treatment to an

individual without a disability, unless the disability impacts the effectiveness, or ease of

administration of the treatment itself, or has a medical effect on the condition to which the

treatment is directed."  *Id.* § 84.56(b)(3).  This prohibition applies to *offers* to provide treatment

as well as to instances where treatment is actually provided.  Nondiscrimination on the Basis of

Disability in Programs or Activities Receiving Federal Financial Assistance, 89 F.R. 40066,

40083 ("§ 84.56(a)'s prohibition on discrimination on the basis of disability can encompass

instances where a recipient offers [...] treatment.").

146.    Defendants violate HHS's regulations implementing Section 504 by offering

purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on

the basis of disability, that they do not offer to others.  None of the exceptions to the prohibition

on offering medical treatment to only people with disabilities apply to the provision of assisted

suicide to people with life-threatening disabilities.  Life-threatening disabilities do not impact

"the effectiveness" of assisted suicide drugs, and such disabilities do not make it easier to

administer assisted suicide drugs.  "Terminal" or life-threatening disabilities also do not have "a

medical effect on the condition to which" assisted suicide drugs are "directed" because assisted

suicide drugs are not directed at treating any specific conditions.  These drugs are instead

directed at terminating life.

147.    The United States DOJ is charged under Executive Order 12250 with

coordinating the implementation of Section 504.  28 C.F.R. § 41.1.  Pursuant to this mandate, the

DOJ has also issued regulations defining forms of discrimination prohibited by Section 504.  The

regulations prohibit schemes that offer aids, benefits, or services to people with disabilities that

are "not equal to that afforded others," 28 C.F.R. § 41.51(b)(1)(ii)), not as effective as those

afforded to others, *id.* § 41.51(b)(1)(iii), that are "different or separate" from those provided to

others unless the separateness is necessary to provide equally effective services, *id.* §

41.51(b)(1)(iv), that limit a person's enjoyment of rights, privileges, advantages or opportunities

enjoyed by others, *id.* § 41.51(b)(1)(vii), that are administered through criteria or methods that

have the effect of discriminating on the basis of disability, *id.* § 41.51(b)(3)(i).  EOLOA operates

in all of these forms to harm persons with life-threatening disabilities.  EOLOA's rapid pathway

to death is a separate, unequal and less effective way of responding to suicidality, compared with

Colorado's ordinary suicide prevention programs.  EOLOA channels persons with life-

threatening disabilities into this separate, unequal and less effective way of responding to

suicidality, hastening deaths that could be avoided for months, years, or even decades.

148.    Defendants have thus excluded and continue to exclude Plaintiffs from

participation in, and denied them the benefits of, or otherwise discriminated against them in,

Defendants' suicide prevention programs and activities in violation of Section 504 of the

Rehabilitation Act.

149.    Furthermore, by carving out physician participation in EOLOA from requirements

that otherwise apply to physicians and advance practice nurses responding to suicidal patients

and by failing to investigate any physicians for violating EOLOA, Defendants deny people with

life-threatening disabilities the benefits of Defendants' programs, services, and activities of

regulation of the medical profession and quality of medical care in violation of Section 504 of

the Rehabilitation Act.

150.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted,

Plaintiffs and their members will suffer irreparable harm in that they will continue to be

discriminated against and denied equal access to the program or activity operated and overseen

by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees

pursuant to 29 U.S.C. § 794(a).

WHEREFORE Plaintiffs pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**(Affordable Care Act Section 1557, 42 U.S.C. § 18116)**
**Against All Defendants**

151.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in

the preceding paragraphs of this Complaint.

152.    Section 1557 of the Affordable Care Act provides that "an individual shall not, on

the ground prohibited under … section 794 of title 29 [Section 504 of the Rehabilitation Act], be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under,

any health program or activity, any part of which is receiving Federal financial assistance,

including credits, subsidies, or contracts of insurance, or under any program or activity that is

administered by an Executive Agency or any entity established under this title (or amendments).

The enforcement mechanisms provided for and available under such title VI, title IX, section

794, or such Age Discrimination Act shall apply for purposes of violations of this subsection."

42 U.S.C. § 18116(a).

153.    Defendants operate health programs or activities receiving federal financial

assistance for purposes of Section 1557.  Such health programs or activities include but are not

limited to health programs or activities operated by Defendants CDPHE, including chronic

disease prevention; general promotion of health and wellness; health facilities licensure and

certification; consumer protection; and suicide prevention, among other activities, and the

collection and review of documented submitted by providers under EOLOA, the regulation and

control of the healing arts performed by Defendant CMB, and the suicide prevention programs

operated by the Office of Suicide Prevention within Defendant CDPHE,

154.    An "individual with a disability" is defined under the statute, in pertinent part, as

"an individual [who has] a physical or mental impairment that substantially limits one or more

major life activities of such individual."  29 U.S.C. § 705(20)(B) (referencing 42 U.S.C.

§ 12102).  "Qualified" means, with respect to services, a person who meets the essential

eligibility requirements for the receipt of such services.  28 C.F.R. § 41.32.

155.    Because Plaintiffs are, or have members or constituents who are, qualified

individuals with disabilities as defined in Section 504, as set forth above, they are also qualified

individuals with disabilities under Section of the ACA.

156.    Defendants' suicide prevention services in Colorado are health programs or

activities within the meaning of Section 1557 of the ACA and must comply with Section 1557's

antidiscrimination requirements.  The Colorado Medical Board's regulation of the medical

profession and enforcement of rules and laws applicable to medical professionals are programs,

are health programs or activities within the meaning of Section 1557 of the ACA

157.    Defendants violate Section 1557 of the ACA by offering purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on the basis of disability, that they do not offer to others.  EOLOA's rapid pathway to death is a separate, unequal and less effective way of responding to suicidality, compared with Colorado's ordinary suicide prevention programs.  EOLOA channels persons with life-threatening disabilities into this separate, unequal and less effective way of responding to suicidality, hastening deaths that could be avoided for months, years, or even decades.

158.    Defendants have thus excluded and continue to exclude Plaintiffs from participation in, and denied them the benefits of, or otherwise discriminated against them in, Defendants' suicide prevention programs and activities in violation of Section 1557 of the ACA.

159.    Furthermore, by carving out physician participation in EOLOA from requirements that otherwise apply to physicians and advance practice nurses responding to suicidal patients and by failing to investigate any physicians for violating EOLOA, Defendants deny people with life-threatening disabilities the benefits of Defendants' health programs and activities of regulation of the medical profession and quality of medical care in violation of Section 1557 of the ACA.

160.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be discriminated against and denied equal access to the program or activity operated and overseen by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to Section 1557 of the ACA.

WHEREFORE Plaintiffs pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF
### (14th Amendment Equal Protection, 42 U.S.C. § 1983)
### Against All Defendants

161.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

162.    The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

163.    EOLOA is unconstitutional because it treats people with life-threatening disabilities on unequal terms with similarly situated people without a rational basis or compelling interest.

164.    EOLOA discriminates against those with life-threatening disabilities, denying protections and safeguards, without any rational basis.  This undermines and interferes with the State's interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently.  There is no compelling or even rational basis to treat the lives of people with life-threatening disabilities any different from other groups of people ineligible to participate in EOLOA who nevertheless share similar concerns as those with such disabilities.  However, under the current application of EOLOA, those without life-threatening disabilities are not counseled to, and assisted with, killing themselves, but those with such disabilities are.

165.    Further, terminal diagnoses are inherently uncertain.  Those with life-threatening disabilities, deemed "terminal" under the Act, can make full recoveries, heightening the uncertainty of a terminal diagnosis.

166.    Because EOLOA implicates a fundamental right—the right to live—the

discrimination warrants a heightened level of review.

167.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted,

Plaintiffs and their members will suffer irreparable harm in that they will continue to be

discriminated against through the application of EOLOA by Defendants.  Consequently,

Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

WHEREFORE Plaintiffs pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF
### (14th Amendment Due Process, 42 U.S.C. § 1983)
### Against All Defendants

168.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in

the preceding paragraphs of this Complaint.

169.    The Due Process of the Fourteenth Amendment provides that no State shall

deprive any person of life, liberty, or property without due process of law.

170.    **Substantive Due Process.**  Plaintiffs' constituents and/or members, and Plaintiffs

themselves, have a fundamental right under the Due Process Clause to protections and security

for their right to live, and this fundamental right cannot be waived without due process.  This

fundamental right of protection of life is grounded in the nation's history and legal traditions,

which have punished or otherwise disapproved of assisting suicide and generally rendered such

assistance a crime.  The U.S. Supreme Court recognized in *Washington v. Glucksberg*, 521 U.S.

702, 732 (1997), that assisted suicide laws pose a "risk of harm [that] is greatest for the many

individuals in our society whose autonomy and well-being are already compromised by poverty,

lack of access to good medical care, advanced age, or membership in a stigmatized social

group." The Supreme Court grounded this traditional protection against assisted suicide in "over

700 years" of common law tradition.  *Id.* at 711-18.

171.    EOLOA violates the Due Process Clause by denying the fundamental interest in the preservation of life to individuals whose doctors diagnose them with life-threatening disabilities and prescribe lethal drugs on that basis.

172.    Here, plaintiffs do not assert a substantive due process right to state-provided suicide prevention.  Plaintiffs assert a right to be free from a state-created system that increases the risk of death by suicide through the licensing of medical providers to prescribe lethal medications under a system that withdraws all of the protections that the state normally provides against dangerous medical practices.  By enacting and enforcing EOLOA, the Defendants have created a danger of state-endorsed suicide by lethal drugs, targeted specifically at the groups of persons with life-threatening disabilities represented by Plaintiffs, putting the Plaintiffs and their constituents at substantial risk of serious, immediate, and proximate harm.  Defendants have acted recklessly and with conscious disregard of the risks of harm created by the EOLOA system of State-endorsed medical suicide, in a manner that shocks the conscious.

173.    **Procedural Due Process.**  Defendants also violate the Due Process Clause, as elucidated by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Goldberg v. Kelly*, 397 U.S. 254 (1970), by failing to include in EOLOA sufficient safeguards to prevent even the deaths that EOLOA purports to prevent—those caused by impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment.  Procedural due process considers how much process must be afforded depending on the extent of grievous loss to be suffered and whether the interest in avoiding that loss outweighs the governmental interest. *Goldberg*, 397 U.S. at 262-63.  Here, the private interest is avoidance of suicide caused by

impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment. Such suicides would be "erroneous" under the EOLOA framework for purposes of due process. Defendants violate procedural due process because they do not do enough to prevent  erroneous suicides by (1) allowing a patient to make a request to kill themselves one week in advance, sometimes even immediately, (2) allowing the determination of eligibility to be made by a non-physician, (3) allowing the consulting provider that confirms eligibility to also be a non-physician, (4)  not requiring a mental health evaluation, despite the strong nexus between life-threatening disabilities, eating disorders, and spinal cord injuries, on the one hand, and depression and suicidality on the other, (5) not making clear whether the prognosis of six months or less takes into account alternative treatment options given that life expectancy prognoses for people with "terminal" disabilities can be inaccurate, for example given that eating disorders are fully treatable, and, with medical treatment, physical therapy, mobility aids, and other supports, people with spinal cord injuries can live long lives and obtain substantial independence and autonomy, (6) requiring a provider to "discuss" alternative options, but not requiring them to make any available to the patient, and (7) not requiring any oversight at the time of ingestion that would confirm whether the patient was coerced, suffering from impaired judgment at the time of ingestion, or whether the patient was even still eligible at the time of ingestion given the unreliability of life expectancy prognoses.

174.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be deprived due process by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

WHEREFORE Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment against Defendants STATE OF

COLORADO, JARED POLIS, [et al.], and each of them, as follows:

1.      Declaring that EOLOA violates Title II of the Americans with Disabilities Act on its face and as applied to people with life-threatening disabilities generally;

2.      Declaring that EOLOA violates Section 504 of the Rehabilitation Act on its face and as applied to people with life-threatening disabilities generally;

3.      Declaring that EOLOA violates Section 1557 of the Affordable Care Act on its face and as applied to people with life-threatening disabilities generally;

4.      Declaring EOLOA unconstitutional under the Fourteenth Amendment's Equal Protection Clause on its face and as applied to people with life-threatening disabilities generally;

5.      Declaring EOLOA unconstitutional under the Fourteenth Amendment's Due Process Clause on its face and as applied to people with life-threatening disabilities generally;

6.      Preliminarily and permanently enjoining Defendants from enforcing EOLOA; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4709655.17]

70

7.      Granting such other and further relief as this Court may deem just and proper,

including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and

litigation expenses.

Dated: June 30, 2025

Respectfully Submitted,


By: *s/ Michael Bien*
Michael Bien, Cal. Bar No. 96891
Ernest Galvan, Cal. Bar No. 196065 *pending admission*
Kara Janssen, Cal Bar No. 274762
Luma Khabbaz, Cal Bar No. 351492
mbien@rbgg.com
egalvan@rbgg.com
kjanssen@rbgg.com
lkhabbaz@rbgg.com
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830

Ian Speir, Col. Bar No. 45777
ian@covtlaw.com
COVENANT LAW PLLC
13395 Voyager Pkwy.
Suite 130, Box 732
Colorado Springs, CO 80921

Attorneys for Plaintiffs